916 A.2d 586

**COMMONWEALTH of Pennsylvania, Appellee,**

**v.**

**Beth Ann MARKMAN, Appellant.**

Supreme Court of Pennsylvania.

Argued May 11, 2004.

Re–Submitted Nov. 21, 2006.

Decided Feb. 21, 2007.

254

256

William Grant Braught, Esq., Carlisle, for Beth Ann Markman.

Jill Michelle Spector, Esq., National Clearinghouse for the Defense of Battered Women, for National Clearinghouse for the Defense of Battered Women.

Jaime M. Keating, Esq., Amy Zapp, Esq., Harrisburg, for Commonwealth of Pennsylvania.

BEFORE: CAPPY, C.J., and CASTILLE, SAYLOR, EAKIN, BAER and BALDWIN, JJ.

### *OPINION*

Justice SAYLOR.[1]

This is a direct appeal from a sentence of death imposed by the Cumberland County Court of Common Pleas, following Appellant Beth Ann Markman's conviction of the first-degree murder of Leslie White and related charges. We affirm in part, reverse in part, and remand.

## I. Background

During the summer of 2000, shortly after graduating from high school, Leslie White, the victim in this case, began working in the photo shop of a Wal–Mart store in Silver

---

1. This case was reassigned to this author.

Springs Township, Cumberland County. Throughout the course of the events leading to her death, White lived at home with her parents and drove her new black Jeep Cherokee to work, as well as to her classes at Harrisburg Area Community College ("HACC"), where she was a freshman. White had a particular interest in art and photography, and was pursuing studies in these subjects. The prior year, her parents gave her a camera costing approximately $600, which she continued to use.

During her first day of employment at Wal–Mart on August 2, 2000, White met Appellant's co-defendant, William Housman, who also started working at the store that day. White and Housman struck up a friendship, which eventually became romantic in nature. Unbeknownst to White, however, Housman had been involved with Appellant for some time, and was living with her in a trailer park in Newville, Cumberland County. In fact, Appellant and Housman had cohabited for nearly two years, including a period of time in which they previously had resided in Virginia. Some time in August of 2000, Appellant discovered that Housman was dating White, which led to a series of escalating arguments between Appellant and Housman. Around this time, Appellant's friends and co-workers noticed that Appellant began showing dark bruising around her eyes, neck, and arms, which Appellant attributed to fights between herself and Housman.[2] Several individuals testified that Appellant also became increasingly temperamental, and expressed her anger toward White by referring to her as a "f——ing bitch" and stating that she would "kick her ass" or "kill her" if she ever got hold of her. At one point, Appellant called White at work, and White appeared frightened immediately afterward.

By the end of August, when Appellant realized that Housman had not terminated his relationship with White, she evicted him from the trailer and changed the lease to reflect

**2.** During this time period, Appellant sustained injuries serious enough to require a visit to the emergency room. At that time, she told the hospital staff that she had been in an automobile accident. At trial, however, she stated that the wounds were inflicted by Housman, and that she had lied to the hospital employees to protect him.

her name only. She also called the domestic violence hotline to obtain a protection-from-abuse order due to her fear that Housman might retaliate, and mentioned an incident in which he had previously broken into the trailer. No order was issued, however, because Appellant failed to attend the requisite in-person interview. Moreover, approximately two weeks later, in mid-September of 2000, Appellant and Housman reconciled and she permitted him to move back in. Still, Appellant did not place Housman's name back on the lease, and she told her probation officer that Housman would have to earn back her trust. Appellant's probation officer testified that Appellant wanted White to come to the trailer so that Housman could finally terminate his affair with White in Appellant's presence.

Within a week after reconciling, Appellant and Housman made plans to move back to Virginia where, it was thought, their relationship would improve. On September 21, 2000, they traveled to an area of southern Virginia where Housman used to work, and told friends that they anticipated relocating to that region. However, shortly after returning to Pennsylvania after this brief visit to Virginia, Appellant suspected that Housman was trying to resume relations with White. Whether or not this was true, it is fairly certain that Housman and White were no longer dating each other at this time. Indeed, White had become involved in with a fellow student at HACC. Nevertheless, there was evidence that Housman had not fully accepted this state of affairs, and Appellant caught Housman in several apparent lies concerning his whereabouts and his dealings with White. Appellant thus concluded that Housman was not being forthright concerning his intentions, which led to another series of altercations culminating on October 2, 2000, when Appellant again required Housman to move out of the trailer. That evening, Housman disabled Appellant's car by removing wires from the engine; after the police were called to the scene, Housman replaced the wires.

Two days later, on October 4, 2000, at approximately 5:30 p.m., Appellant was seen driving her car, with Housman in the front passenger's seat, to a local Sheetz gas station/conven-

ience store. They parked, proceeded to the pay phone, and called White at Wal–Mart to lure her to the trailer (at this time Appellant's trailer did not have telephone service). Housman placed the call and stated, falsely, that his father had died; he asked White to come to the trailer to console him. According to Appellant, Housman told White that Appellant had gone out of town, and hence, only he (Housman) would be at the trailer when White arrived. This ploy was effective, as White became concerned that Housman might be suicidal over the supposed loss of his father. Thus, she left her shift early at 6:16 p.m. and drove her jeep to the trailer to comfort him.

When White arrived, Housman admitted her into the living room, and the two began to talk. Appellant remained in the bedroom with the door closed, and White initially did not know she was there. Subsequently, while White and Housman were sitting on the couch conversing, Appellant came out of the bedroom and stood by the front door. Appellant testified that she did this because she was having trouble breathing due to her asthma, and needed fresh air.[3] She also stated that, just before coming out of the bedroom, she heard White cry out because Housman had hit her on the hand with a hammer, and her hand appeared swollen. In any event, shortly after coming out of the bedroom and standing by the door, Appellant acted together with Housman to subdue White, binding her hands and feet with speaker wire, and placing a large piece of cloth in her mouth, as well as a tight gag over her mouth and around the back of her neck to secure the cloth. With White bound and gagged, Housman and Appellant stepped outside to smoke a cigarette and discuss the situation. Upon returning to the trailer, Appellant held the victim down, while Housman strangled her with speaker wire and the crook of his arm, killing her. During the struggle, White reached up and scratched Appellant on the neck, leaving dark red marks. According to the medical examiner, White died of asphyxiation caused by Housman's strangulating actions together with the

3. There was independent evidence that Appellant was being treated for asthma.

blockage of air due to the cloth stuffed in her mouth. *See* N.T. 555–56.

After the killing, Appellant retrieved a canvas tent from a shed near the trailer while Housman waited inside. She and Housman wrapped the body in the tent and placed it in the back of White's jeep. They then drove in two cars—with Housman driving White's jeep, followed by Appellant in her own Buick sedan—to Housman's father's home in Franklin County, Virginia. They ultimately disposed of White's body by placing it in the trunk of an abandoned car in a remote area of neighboring Floyd County, on land owned by Housman's mother; they also discarded White's personal effects, except for her camera, which they sold to a pawn shop.

Housman and Appellant remained in southern Virginia for several days, staying alternately with friends of Housman and with Housman's father, and continuing to drive White's black jeep, which Housman held out as his own. After White's parents filed a missing persons report, however, authorities tracked the jeep to Housman's father's house. Franklin County Police Officer Brian Vaughn went to the house to investigate, and interviewed Housman and Appellant separately in his patrol car concerning the jeep. At this time, nobody except Housman and Appellant knew that White was dead. While in the officer's vehicle, Housman indicated that the jeep was borrowed from a friend; he then went back inside his father's house, and Appellant came out and sat in the police vehicle to answer questions. She did not contradict Housman's claim that he had borrowed the jeep from a friend; in response to the officer's questions, she also denied that Housman had ever been abusive toward her.

Following this incident, Housman and Appellant concluded that the jeep was a liability and disposed of it on the same piece of property where they had hidden White's body. Notwithstanding these efforts to conceal the evidence, the police soon discovered the jeep, as well as White's partially-decomposed body in the abandoned car, still bound and gagged. They arrested Appellant and Housman at a friend's house the evening of October 11, 2000, exactly one week after the

murder. The police also retrieved White's camera from the pawn shop and developed the film inside of it. The film contained several photographs, taken after the murder, that were described for the jury; in one of these photos, Appellant appears to be laughing while Housman pretends to choke her. *See* N.T. 477.

After receiving warnings pursuant to *Miranda v. Arizona,* 384 U.S. 436, 479, 86 S.Ct. 1602, 1630, 16 L.Ed.2d 694 (1966), both defendants waived their rights and agreed to provide statements to the Virginia police. Each separately confessed to having participated in killing Leslie White. The confessions were recorded on audiotape and transcribed. Housman admitted that he killed White by strangling her, but claimed that Appellant had instigated the homicide to eliminate the source of one of their problems so they could start their relationship anew. He maintained that Appellant had directed him to tie White up and strangle her, and that Appellant forced compliance by hitting him with a hammer that she had in her possession, and then spinning it around in her hand in an apparent threat to use it again if he did not obey her orders. He stated that, after the victim was killed, Appellant, a certified nursing assistant, used a stethoscope to verify the absence of a heartbeat before wrapping the victim's body in the tent.[4] For her part, Appellant also conceded that she had participated in the killing, stating that she initially bound and gagged the victim, and later held her down while Housman strangled her. She insisted, however, that Housman concocted the murder scheme in order to steal White's jeep, and that Housman had coerced Appellant into aiding him in this endeavor by threatening to kill her with a hunting knife if she did not obey his orders. Appellant contended, moreover, that Housman also wore down her resistance by threatening and terrorizing her throughout the previous night, holding a knife to her throat and forcing her to remain naked in the bedroom of the trailer. She omitted any mention of a stethoscope, and stated that she only realized the victim had passed away when

---

4. A stethoscope was found in the trailer during a subsequent police search.

the latter's trousers became wet, indicating a loss of bladder control.

█ Following the denial of Appellant's motion to sever her trial from that of Housman, the two were tried together in Cumberland County court from October 22 through November 5, 2001, on one count each of criminal homicide, kidnapping, unlawful restraint, and abuse of a corpse, and two counts of theft by unlawful taking or disposition (pertaining to the jeep and camera), as well as conspiracy as to all of these offenses. Housman elected not to testify during the guilt phase of the trial. During this phase, the Commonwealth played for the jury an audiotape of Housman's confession, referenced above. The tape was altered so that references to Appellant were redacted: a different voice from Housman's, stating, "the other person," was dubbed over these references.[5] Before the tape was played, Appellant objected that allowing the jury to hear it in an obviously-redacted form would violate her Sixth Amendment confrontation rights. *See* N.T. 434–35, 442; *see also id.* at 572, 613, 86 S.Ct. 1602 (continuing objection).[6] The trial court overruled the objection and allowed the jury to hear the tape. The court informed the jury that the tape had been altered to include the words "the other person," that these were not Housman's actual words, and that the jury should

---

**5.** Due to an apparent oversight in the redaction process, there were two instances of non-redaction, such that Housman's specific references to Appellant by name remained on the tape. The first of these instances occurs when Housman states:

Yeah. And I was feeling pretty sure because I knew **the other person,** Beth, was in the back, so I wanted to get it done and over with quick. Commonwealth Exh. 83 (redacted audiotape) (bolding reflects different voice). In the corresponding portion of the transcript, the word "Beth" is replaced by a second instance of "**the other person.**" *See* Commonwealth Exh. 83C at 21. However, this does not accurately reflect the contents of the tape. In the second non-redaction, Housman again makes an incriminating statement about "Beth," and neither the tape nor the transcript contains a redaction. *See id.* at 26.

**6.** The Sixth Amendment to the United States Constitution, which guarantees to criminal defendants the right to confront adverse witnesses, applies to the states through the Fourteenth Amendment. *See Pointer v. Texas,* 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965).

not draw any inferences regarding the insertion of these words. *See* N.T. 437, 567.

Appellant testified in her defense, and asserted that she had been physically abused by Housman during the course of their relationship. She repeated her specific allegations of coercion on the night of the murder, placing them in the context of a broader pattern of longstanding physical abuse by Housman. She also added significant details concerning the crime, including an assertion that Housman had terrorized her for two full days prior to the murder, during which time he had cut her clothes off with a knife, repeatedly raped her, and threatened to "put a .45 in [her] head" or "send [her] home in pieces to [her] daughter" if she did not do as he instructed or tried to escape the trailer, and ordered her to write a letter to White stating that she (Appellant) had moved to Virginia and was no longer involved with Housman. *See* N.T. 985–86, 990, 1006. She stated as well that, when she and Housman went to the Sheetz convenience store, she was not aware that Housman was planning to call White until he actually called her, *see* N.T. 999, 1169, and that when they returned to the trailer, she tried to escape twice, but each time Housman prevented her from doing so in a violent manner. *See* N.T. 1005–06. Appellant stated further that, even after White was bound and gagged, she (Appellant) did not know that Housman actually planned to kill her. *See* N.T. 1003, 1012, 1016, 1107. In this regard, Appellant testified that when she and Housman returned to the trailer after smoking a cigarette, White's gag had slipped down from her mouth and White requested some water. When Appellant went to the kitchen to get her a glass of water, Appellant heard screaming as Housman began to choke White. According to Appellant, at that point Housman ordered her to come back to the living room and pull the gag back up over White's mouth. Appellant complied and, after Housman continued to strangle White, it ultimately became apparent that White had died. Appellant maintained that she obeyed Housman during this time and did not attempt to prevent him from choking White because she was afraid that he might kill her as well. *See* N.T. 1017–18. As for her

statement to Officer Vaughn that Housman had never been abusive, she explained that she was only trying to protect Housman. Finally, concerning the photograph, she stated that she was laughing because Housman was poking her in the side and she is ticklish.

Based in part upon the above testimony, Appellant requested an instruction on the defense of duress. The trial court refused this request, and the jury ultimately found both defendants guilty on all charges, including first-degree murder. At the conclusion of the penalty phase, the jury found, as to Appellant, the aggravating circumstance proposed by the Commonwealth—that the killing was committed in perpetration of the felony of kidnapping, *see* 42 Pa.C.S. § 9711(d)(6)—and two mitigating circumstances.[7] The jury determined that the single aggravating factor outweighed the mitigating circumstances, and set the penalty at death. Subsequently, on February 1, 2002, the trial court formally imposed a sentence of death, together with an aggregate term of 20 to 40 years' incarceration on the other counts (except unlawful restraint, which the court considered to merge with kidnapping for sentencing purposes).

## II. Sufficiency of the Evidence

### A. *First-degree murder*

 Although Appellant does not challenge the sufficiency of the evidence supporting her first-degree murder conviction, this Court undertakes such analysis in every case in which the death penalty is imposed. *See Commonwealth v. Malloy,* 579 Pa. 425, 435, 856 A.2d 767, 773 (2004). Even where, as here, a new trial is ordered, sufficiency review is necessary because a first-degree murder conviction would be precluded on remand if the evidence in the first trial was insufficient to sustain the guilty verdict. *See Bullington v. Missouri,* 451 U.S. 430, 442, 101 S.Ct. 1852, 1860, 68 L.Ed.2d

---

7. Specifically, the jury found that Appellant's participation in the killing was relatively minor, *see* 42 Pa.C.S. § 9711(e)(7), as well as the "catch-all" mitigator, *see* 42 Pa.C.S. § 9711(e)(8) ("[a]ny other evidence of mitigation concerning the character and record of the defendant and the circumstances of his offense"). *See* N.T. 1444, 1457.

270 (1981); *Greene v. Massey*, 437 U.S. 19, 24, 98 S.Ct. 2151, 2154, 57 L.Ed.2d 15 (1978); *Commonwealth v. Sadusky*, 484 Pa. 388, 395, 399 A.2d 347, 350 (1979). The standard is whether the evidence, viewed in the light most favorable to the Commonwealth as verdict winner, is adequate to enable a reasonable jury to find every element of the crime beyond a reasonable doubt. *See Commonwealth v. Watkins*, 577 Pa. 194, 208, 843 A.2d 1203, 1211 (2003).

To obtain a first-degree murder conviction, the Commonwealth must demonstrate that a human being was unlawfully killed, the defendant did the killing, and the defendant acted with a specific intent to kill. *See* 18 Pa.C.S. §§ 2501; 2502(a, d); *Commonwealth v. DeJesus*, 580 Pa. 303, 308, 860 A.2d 102, 105 (2004). Moreover, the jury may convict the defendant as an accomplice so long as the facts adequately support the conclusion that he or she aided, agreed to aid, or attempted to aid the principal in planning or committing the offense, and acted with the intention to promote or facilitate the offense. *See Commonwealth v. Romero*, 555 Pa. 4, 17, 722 A.2d 1014, 1020 (1999); *Commonwealth v. Thompson*, 543 Pa. 634, 645–46, 674 A.2d 217, 222–23 (1996).[8] The amount of aid "need not be substantial so long as it was offered to the

8. Thus, relative to accomplice liability for first-degree murder, the Commonwealth must prove that the defendant harbored a specific intent to kill; it is not sufficient to prove that the defendant was an accomplice to homicide generally, and that the principal had the requisite intent. *See Commonwealth v. Huffman*, 536 Pa. 196, 199, 638 A.2d 961, 962 (1994); *Commonwealth v. Bachert*, 499 Pa. 398, 406, 453 A.2d 931, 935 (1982). Here, the trial judge gave the jury a general accomplice liability instruction, but did not explain that the defendant must personally have had a specific intent to kill to be convicted of first degree murder as an accomplice. While this omission constituted error under the *Bachert/Huffman* rule, *see Commonwealth v. Chester*, 557 Pa. 358, 380 n. 12, 733 A.2d 1242, 1253 n. 12 (1999) ("A general accomplice charge, while legally correct on the law of accomplice liability, when given in conjunction with a charge of first degree murder must clarify for the jury that the specific intent to kill necessary for a conviction of first degree murder must be found present in both the actual killer and the accomplice."), the error is irrelevant for purposes of a sufficiency analysis and, moreover, the parties have not raised the issue. On remand, however, the trial court should be aware of the need to inform the jury of this aspect of accomplice liability as it relates to first degree murder.

principal to assist him in committing or attempting to commit the crime." *Commonwealth v. Murphy,* 577 Pa. 275, 286, 844 A.2d 1228, 1234 (2004). However, simply knowing about the crime or being present at the scene is not enough. *See id.* In evaluating whether the evidence was sufficient to support the conviction, we bear in mind that: the Commonwealth's burden may be sustained by means of wholly circumstantial evidence; the entire trial record is evaluated and all evidence received against the defendant considered; and the trier of fact is free to believe all, part, or none of the evidence when evaluating witness credibility. *See Watkins,* 577 Pa. at 208–09, 843 A.2d at 1211; *Commonwealth v. Brockington,* 500 Pa. 216, 220 n. 1, 455 A.2d 627, 629 n. 1 (1983).

The evidence, most of it undisputed, revealed that White was unlawfully killed and that Appellant participated in the events causing her death, including binding her hands and feet, stuffing a cloth into her mouth, and tying a gag around her neck. Appellant was close enough to White during the killing that White was able to scratch Appellant's neck. Immediately after the homicide, Appellant retrieved a tent in which to wrap White's body and helped Housman load the body into the back of White's jeep. She also fled the jurisdiction, lied to authorities in Virginia concerning the source of the jeep, helped Housman dispose of White's body and belongings in a remote area, and left Housman's father's house-the only place where the police knew to look for her-when the authorities began to suspect that the jeep was stolen. *See generally Commonwealth v. Johnson,* 576 Pa. 23, 53, 838 A.2d 663, 681 (2003) (noting that flight and concealment can constitute circumstantial proof of consciousness of guilt). Finally, Appellant expressed her desire to beat or kill White prior to the murder, and stated afterward that she had "taken care of" White so that the latter could no longer interfere with Appellant's relationship with Housman. These facts are sufficient to sustain a finding that Appellant acted with a specific intent to kill Leslie White. In light of the expert testimony that the cloth rag forced into White's throat likely contributed to her

asphyxiation, the evidence supported a finding of guilt as a principal or an accomplice.

## B. Kidnapping

Appellant challenges the sufficiency of the evidence supporting her kidnapping conviction. Again, this claim must be addressed notwithstanding the grant of a new trial because, absent sufficient evidence, a re-trial on this count would be precluded. *See Bullington,* 451 U.S. at 442, 101 S.Ct. at 1860. Under the Crimes Code,

> a person is guilty of kidnapping if he unlawfully removes another person a substantial distance under the circumstances from where he is found, or if he unlawfully confines another person for a substantial period in a place of isolation with any of the following intentions: (1) To hold for ransom or reward, or as a shield or hostage; (2) To facilitate commission of any felony or flight thereafter; (3) To inflict bodily injury on or to terrorize the victim or another; (4) To interfere with the performance by public officials of any governmental or political function.

18 Pa.C.S. § 2901(a). Removal or confinement is unlawful if accomplished by force, threat, or deception. *See* 18 Pa.C.S. § 2901(b).

Appellant does not dispute that the travel distance from Wal–Mart to the trailer (approximately 25 miles, *see* N.T. 560) represents a "substantial distance" for purposes of Section 2901(a), or that White was induced by deception to make the trip, thus constituting an unlawful removal for purposes of Section 2901(b). *Accord State v. Colbert,* 221 Kan. 203, 557 P.2d 1235, 1240 (1976) (finding unlawful removal where the victim was induced by deception to drive his car to a spot where he had not previously intended to go). Nor does she contest that the purpose for which White was lured to the trailer included the facilitation of a felony or the terrorization or infliction of bodily injury upon her. Rather, Appellant focuses her argument on the position that, because she did not personally place the deceptive phone call, there was insufficient evidence that she was guilty of unlawful removal.

While Appellant is correct that it was Housman who directly deceived White, she overlooks the significance of evidence tending to show that she acted as an accomplice in the scheme, and thus, shared equal responsibility. *See* 18 Pa.C.S. § 306; *Commonwealth v. Bradley*, 481 Pa. 223, 228, 392 A.2d 688, 690 (1978). In particular, Appellant drove Housman to the convenience store where he placed the call, and drove him back to the trailer in anticipation of White's arrival. Thus, Appellant clearly aided Housman in committing the unlawful removal. These actions also support the finding that she intended to assist Housman in luring White to the trailer, as the sole purpose of the trip to the store was to phone White. Although Appellant testified that she did not know Housman's intentions when she drove him to the store, the jury was not required to believe her. Additionally, the proofs discussed above sustaining Appellant's guilt of murder—including the threats that she made against White to third parties and her statement to her probation officer that she would like to have White come to the trailer so she could confront her—support a finding that, when Appellant assisted Housman in luring White to the trailer, she was aware of the purpose of these activities and undertook them with an intent to terrorize or inflict bodily injury upon White, or otherwise to facilitate the commission of a felony. *See* 18 Pa.C.S. § 2901(a)(2, 3); *Sadusky*, 484 Pa. at 391, 399 A.2d at 348 (stating that, where the Commonwealth relies upon circumstantial proof to establish guilt, "the facts and circumstances need not be absolutely incompatible with defendant's innocence, but the question of any doubt is for the jury unless the evidence be so weak and inconclusive that as a matter of law no probability of fact can be drawn from the combined circumstances" (quoting *Commonwealth v. Sullivan*, 472 Pa. 129, 149–50, 371 A.2d 468, 478 (1977))).

We note as well that there was evidence of unlawful confinement by Appellant. By her own admission, Appellant bound White's hands and feet, placed a cloth rag into her mouth, and gagged her so that she could not cry out. Thus, White was confined in a place of isolation because she was separated from

the normal protections of society in a manner which made discovery or rescue unlikely. *See* MODEL PENAL CODE § 212.1, cmt. 3 (stating that the concept of a place of isolation "is not a geographical location but rather effective isolation from the usual protections of society," and observing that one's own apartment in a city may "be regarded as a 'place of isolation,' if the circumstances of detention made discovery or rescue unlikely"); *accord Commonwealth v. Jenkins,* 455 Pa.Super. 152, 156, 687 A.2d 836, 838 (1996); *Commonwealth v. Mease,* 357 Pa.Super. 366, 370, 516 A.2d 24, 26 (1986); *Commonwealth v. Hook,* 355 Pa.Super. 10, 13–14, 512 A.2d 718, 719 (1986).

Nevertheless, Appellant questions whether the period of confinement was substantial, and asserts that the record does not reveal the exact amount of time that White was bound and gagged before she was killed. However, the determination of a substantial period subsumes not only the exact duration of confinement, but also whether the restraint, by its nature, was criminally significant in that it increased the risk of harm to the victim. *Accord State v. La France,* 117 N.J. 583, 569 A.2d 1308, 1313 (1990). Presently, it is undisputed that White was not immediately killed after being tied up, and that she was left alone inside the trailer while the perpetrators stepped outside to retrieve cigarettes, smoke them, and discuss what to do next. If White had not been confined as she was, she could have escaped or at least cried out for help; also, the confinement period was sufficient to cause an increased risk of harm due to the blockage of oxygen from the wadded-up rag in her throat. Indeed, the medical examiner identified this blockage as contributing to White's death at the time she was strangled. Thus, the jury was entitled to conclude that White was confined in a place of isolation for a substantial period. *Cf. Hook,* 355 Pa.Super. at 14, 512 A.2d at 720 (finding a confinement period of one hour to be substantial).

In light of the overall course of conduct undertaken by Appellant which subsumed activities related to both removal and confinement, we find the evidence sufficient to support a finding of guilt on the kidnapping charge.

### III. Appellant's Confrontation Clause claim

 Appellant makes several allegations of trial court error relating to both the guilt and penalty phases of trial. In one of these claims, Appellant argues that the court abused its discretion by denying her motion to sever, and erred by allowing the jury to hear a redacted audiotape of Housman's confession implicating her in the murder. She maintains that this violated her Sixth Amendment confrontation rights as it was evident to the jury that the tape was redacted because the phrase "the other person," in a distinct voice, was dubbed over the name "Beth" or "Markman." Appellant states that this error was compounded when the court affirmatively told the jury that the tape had been altered in this manner. We agree with Appellant that it was error to allow the jury to hear this tape.

In *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), the Supreme Court considered whether Bruton's Sixth Amendment confrontation rights were violated by the introduction, at a joint trial, of a non-testifying co-defendant's confession that facially incriminated Bruton, and if so, whether this violation could be cured by a contemporaneous jury instruction to consider the confession as against the co-defendant only, and not against Bruton. The Court explained that, notwithstanding the benefit of joint trials and the ordinary rule that the jury is presumed to follow the instructions of the court,

> there are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored. Such a context is presented here, where the powerfully incriminating extrajudicial statements of a codefendant, who stands accused side-by-side with the defendant, are deliberately spread before the jury in a joint trial. Not only are the incriminations devastating to the defendant but their credibility is inevitably suspect.... The unreliability of such evidence is intolerably compounded when the alleged accomplice, as here, does not testify and cannot be

tested by cross-examination. It was against such threats to a fair trial that the Confrontation Clause was directed. *Id.* at 135–36, 88 S.Ct. at 1627–28. *See generally Commonwealth v. McCrae,* 574 Pa. 594, 612–13, 832 A.2d 1026, 1037–38 (2003); *Commonwealth v. Travers,* 564 Pa. 362, 366–67, 768 A.2d 845, 847 (2001). Thus, as there was no opportunity for Bruton to cross-examine his co-defendant concerning the assertions in the statement, the Supreme Court found that its introduction violated Bruton's confrontation rights, and reversed his conviction. *See also Lee v. Illinois,* 476 U.S. 530, 545, 106 S.Ct. 2056, 2064, 90 L.Ed.2d 514 (1986) (recognizing that a codefendant's confession is "presumptively unreliable as to the passages detailing the defendant's conduct or culpability because those passages may well be the product of the codefendant's desire to shift or spread blame, curry favor, avenge himself, or divert attention to another").

Subsequently, in *Richardson v. Marsh,* 481 U.S. 200, 211, 107 S.Ct. 1702, 1709, 95 L.Ed.2d 176 (1987), the Court concluded that no *Bruton* violation occurs where a confession is altered to remove the defendant's name and any reference to his existence, and a proper limiting instruction is given. Nevertheless—and critical to this appeal—under *Gray v. Maryland,* 523 U.S. 185, 118 S.Ct. 1151, 140 L.Ed.2d 294 (1998), a scenario in which the defendant's name is replaced with the word, "deleted," or the statement is otherwise redacted in such a manner that it clearly refers to the defendant, does not satisfy the strictures of *Bruton. See id.* at 197, 118 S.Ct. at 1157.

 As an initial matter, it is evident that Housman's confession in its unredacted form comes within the *Bruton* rule, as it comprises an attempt by Housman, a non-testifying codefendant, to shift the bulk of the blame to Appellant; as noted, it alleges in substantial detail that Appellant conceived of the plot to kill the victim, directed its execution, and forced Housman to cooperate. Additionally, the manner in which the confession was redacted and presented to the jury falls squarely within the proscriptions enunciated in *Gray.* In that case, the Supreme Court indicated that "redactions that re-

place a proper name with an obvious blank, the word 'deleted,' a symbol, *or similarly notify the jury that a name has been deleted* are similar enough to *Bruton's* unredacted confessions as to warrant the same legal results." *Gray*, 523 U.S. at 195, 118 S.Ct. at 1156 (emphasis added). Here, the audio-taped redaction was accomplished via the dubbing of a different voice over Housman's; the prosecutor told the jury that the tapes were "redacted pursuant to [the trial court's] instructions," N.T. 433; and, before the tapes were played, the judge instructed the jury as follows:

> You will note that the tape has been altered at some point to insert the words, quote, the other person, unquote. It will be obvious to you that these words are not part of the original tape-recorded statement. I am instructing you that these words, quote the other person, unquote, were inserted at my direction based upon the law in Pennsylvania. You are to draw no inference regarding the insertion of these words, and you should listen to the tapes just as if they had not been altered.

N.T. 437. The judge also told the jury, more specifically, that "you may consider the statement of Housman as evidence against Housman. You must not, however, consider the statement as evidence against Markman." N.T. 568. The *Gray* Court explained the difficulties inherent in such an approach:

> For one thing, a jury will often react similarly to an unredacted confession and a confession redacted in this way, for the jury will often realize that the confession refers specifically to the defendant.... Consider a simplified but typical example, a confession that reads "I, Bob Smith, along with Sam Jones, robbed the bank." To replace the words "Sam Jones" with an obvious blank will not likely fool anyone. A juror somewhat familiar with criminal law would know immediately that the blank ... refers to defendant Jones. A juror who does not know the law and who therefore wonders to whom the blank might refer need only lift his eyes to Jones, sitting at counsel table, to find what will seem the obvious answer, at least if the juror hears the judge's instruction not to consider the confession as evi-

dence against Jones, for that instruction will provide an obvious reason for the blank. . . .

For another thing, the obvious deletion may well call the jurors' attention specially to the removed name. By encouraging the jury to speculate about the reference, the redaction may overemphasize the importance of the confession's accusation. . . .

*Id.* at 193, 118 S.Ct. at 1155–56.

The events here mirror the scenario proscribed by *Gray:* Appellant's name was replaced with a phrase that was an obvious (and indeed explicit) substitution, and the jury was admonished not to consider the statement as evidence against Appellant.[9] The redactions by their nature alerted the jury to the fact of alteration, and they did "not likely fool anyone" as to whose name had been removed—particularly as Housman and Appellant were the only two defendants in the courtroom, and, as discussed previously, the tape itself contained two instances in which Housman's express references to "Beth" were left intact. *See supra* note 5. *See generally Gray*, 523 U.S. at 196, 118 S.Ct. at 1157 (observing that accusations made by a statement redacted in an obvious manner are "more vivid than inferential incrimination, and hence more difficult to thrust out of mind" (quoting *Richardson*, 481 U.S. at 208, 107 S.Ct. at 1707)). Moreover, the trial court explicitly revealed the fact of the redactions to the jurors. Accordingly, we agree with Appellant that introduction of this statement in its redacted form violated her *Bruton* confrontation rights for the reasons expressed in *Gray*.[10]

**9.** There is no substantive distinction between using a symbol, a blank, or the word "deleted" to cover over a defendant's name in a declaration reduced to writing, and using a distinct voice intoning the phrase, "the other person," to cover over that same person's name on an audiotape.

**10.** While the manner of alteration in the audiotape is alone sufficient to fail scrutiny under *Gray*, the jury was also provided with a transcript to review while listening to the tape. *See* N.T. 434, 670. The cover page states, "Transcript of *Redacted* Taped Statement of William Housman. . . ." Commonwealth's Exh. 83B (emphasis added). Reflecting the contents of the tape, the transcript uses the bolded, parenthetical phrase, "**(the other person)**" in place of references to Appellant. No other text in the transcript is set in bold type or delimited by parenthe-

Although it is thus evident that error occurred, Appellant is not entitled to a new trial if the error was harmless. *See Commonwealth v. Uderra,* 550 Pa. 389, 399, 706 A.2d 334, 339 (1998) (citing *Schneble v. Florida,* 405 U.S. 427, 430, 92 S.Ct. 1056, 1059, 31 L.Ed.2d 340 (1972)). An error will be deemed harmless if: "(1) the error did not prejudice the defendant or the prejudice was *de minimus;* [or] (2) the erroneously admitted evidence was merely cumulative of other untainted evidence which was substantially similar to the erroneously admitted evidence; or (3) the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict." *Commonwealth v. Young,* 561 Pa. 34, 85, 748 A.2d 166, 193 (1999) (quoting *Commonwealth v. Robinson,* 554 Pa. 293, 305, 721 A.2d 344, 350 (1998)). The Commonwealth bears the burden to prove harmlessness beyond a reasonable doubt. *See id.*

The Commonwealth does not presently make any attempt to carry its burden in this regard, and we are unconvinced from the record that the error was harmless. There was never any dispute that Housman and Appellant were the only individuals involved in the kidnapping and killing of Leslie White, or that Housman's actions were the direct cause of her death. Rather, for purposes of ascertaining Appellant's guilt, the central issue as to both the murder and the kidnapping was whether, and to what extent, Appellant acted with an intention to bring about the kidnapping and killing of White. The degree to which the jurors would believe Appellant's account of the underlying events, as recited both in her confession and in her trial testimony, would therefore determine whether they would find her guilty of these crimes, including whether they would conclude that she acted with a specific intent to kill. On this topic, Housman's confession represented the only proof directly refuting Appellant's claim that Housman forced her

ses. Consequently, from the transcript, as well as the tape, it was evident to the jury that Housman had implicated another individual by name, and that this person's identity was being concealed.

against her will to harm White. Indeed, Appellant's and Housman's accounts of the central facts were irreconcilable. In contrast to Appellant's account, Housman's confession painted Appellant as the individual who directed all of the crucial events to accomplish the binding and killing of White. Under such circumstances, the prejudicial effect of Housman's statement was not *de minimis*. *See generally Young*, 561 Pa. at 85, 748 A.2d at 193 ("It is difficult to imagine any evidence more prejudicial to a defendant than that which identifies the defendant as a perpetrator of a capital crime.").

We also cannot conclude that the remaining uncontradicted evidence of guilt was so overwhelming, and the error's prejudicial effect was so insignificant by comparison, that the error could not have contributed to the verdict. In this regard, because Appellant's testimony contradicted Housman's confession as to the central issues of Appellant's intentions and role in the underlying events, any other, uncontradicted evidence of guilt would have to have come from someone else. *Accord Young*, 561 Pa. at 87 & n. 16, 748 A.2d at 194 & n. 16 (concluding, where the defendant testified and contradicted much of the Commonwealth's evidence, that none of the proofs thus disputed could be used to establish harmless error, as it is not within the province of this Court to determine the comparative credibility of conflicting evidence). This consisted primarily of testimony regarding Appellant's demeanor and statements before and after the murder, as well as her having fled the jurisdiction and assisted Housman in hiding evidence. While these proofs comprised circumstantial evidence of Appellant's state of mind during the actual kidnapping and homicide, they are of limited value to the present analysis because Appellant specifically denied that she acted voluntarily, *see* N.T. 1012–18, 1057, 1166, and additionally stated that she did not have any intention of harming White, but rather, was coerced into taking actions against her will, *see* N.T. 941–42, 967. Particularly in view of the defense claim of coercion, this evidence did not so overwhelmingly prove Appellant's guilt that Housman's statement could not have been a factor in

the jury's decision to convict her.[11]

A central premise of the dissenting opinion is that Appellant "admitted [she] murdered White," that is, she "identified herself as the perpetrator of a capital crime." Dissenting Opinion at 614. As we have detailed above, however, this simply is not the case. Although the dissent discounts Appellant's testimony as "self-serving," *see id.* at 6, whether this Court believes such testimony to be truthful is of no relevance to the present inquiry, as witness credibility assessments are within the jury's exclusive realm. *See Young,* 561 Pa. at 87 n. 16, 748 A.2d at 194 n. 16. The critical fact here is that the crucial aspects of the Commonwealth's case for first-degree murder were plainly contradicted by Appellant's testimony, and thus, under the *Young* line of cases (dating from *Commonwealth v. Story,* 476 Pa. 391, 383 A.2d 155 (1978)), cannot be considered when ascertaining whether the other evidence of guilt is overwhelming. Moreover, the central question for purposes of harmless error is whether the jury might have relied upon Housman's confession in finding that Appellant acted with a specific intent to kill, not whether any specific actions on her part were, in some sense, voluntary.[12] Finally, the dissent also views Housman's confession as only minimally prejudicial, but it does not reconcile its approach with the

11. To the extent that the dissent relies on *Commonwealth v. Groff,* 356 Pa.Super. 477, 514 A.2d 1382 (1986), *see* Dissenting Opinion at 616, that matter is factually and legally distinguishable as it did not involve a *Bruton* violation (indeed, it is a single-defendant case). Also, there the defendant admitted that he intended to shoot the victim, but sought to minimize his culpability solely on the basis that the victim was "screaming and hollering." *Groff,* 356 Pa.Super. at 483, 514 A.2d at 1385. In any event, *Groff's* analysis and holding are obviously not binding upon this Court.

12. For example, the dissent emphasizes Appellant's having driven Housman to Sheetz and having placed a rag in the victim's mouth. *See* Dissenting Opinion at 616. However, Appellant's testimony concerning these events as related above, including that she was acting under duress and that she intended only to gag the victim at Housman's direction, is not so impossible or implausible that it is unnecessary for a jury to pass on the central credibility issue in the case. In this regard, we find significant that it was undisputed at trial that Housman was the individual who actually called the victim to lure her to the trailer, and then strangled her.

fundamental principles arising out of *Bruton,* namely, that this type of shifting of blame onto the defendant results in a high level of prejudice, particularly where the codefendant's account is substantially in dispute. *See, e.g., Commonwealth v. McCrae,* 574 Pa. 594, 614, 832 A.2d 1026, 1038 (2003) (stating that "[i]t is the particularly devastating prejudicial effect and inherent unreliability of a directly incriminating statement made by a non-testifying co-defendant that powered *Bruton* [ ]" (internal quotation marks omitted)).[13]

**13.** In support of its assertion that introduction of the redacted confession was harmless, the dissent also posits that the jury would have understood the "other person" to be Appellant even if the redactions had been completed properly. *See* Dissenting Opinion at 615 ("Under the circumstances, the jury would surely be aware who 'the other person' was, no matter how obvious or discrete the redaction."). However, severance is required "if there is a serious risk a joint trial would compromise a specific trial right of one of the defendants[.]" *Zafiro v. United States,* 506 U.S. 534, 113 S.Ct. 933, 938, 122 L.Ed.2d 317 (1993). Here, the "specific trial right" is the Sixth Amendment right to confront adverse witnesses. *Bruton* is based on the proposition that the prejudice associated with a blame-shifting statement of a non-testifying codefendant cannot be cured by a jury instruction. *Gray* rests on the theory that severance is not required if such prejudice is ameliorated through proper redactions. Thus, the dissent's argument favoring harmless error—that any such amelioration was impossible due to the nature of the case—proves too much; if accepted, it would suggest that Appellant was entitled to a separate trial or exclusion of Housman's statement. Ultimately, however, we need not reach those issues because, in the *Bruton* context, the Supreme Court has drawn a clear distinction between inferences based on the face of the confession due to improper or missing redactions, and those grounded solely on contextual implication, that is, evidentiary linkage extrinsic to a properly-redacted confession. While the latter category may be acceptable under the Sixth Amendment, the former is not. *See Gray,* 523 U.S. at 196, 118 S.Ct. at 1157. This distinction is premised on the presumptive efficacy of curative instructions where the jury need not perform the "mental gymnastics" required to consider a facially incriminatory statement only against the nontestifying codefendant. *Frazier v. Cupp,* 394 U.S. 731, 735, 89 S.Ct. 1420, 1423, 22 L.Ed.2d 684 (1969). Because these principles have been set down by the United States Supreme Court, moreover, we must adhere to them notwithstanding the dissent's argument concerning inevitable prejudice. We also note, in this regard, that where the Supreme Court or this Court has judged a *Bruton* violation to be harmless, it has been due to the presence of overwhelming evidence of guilt apart from the improperly redacted statement, and not because proper redactions would have been ineffectual in any event. *See, e.g., Brown v. United States,* 411 U.S. 223, 231, 93 S.Ct. 1565, 1570, 36 L.Ed.2d 208 (1973); *Schneble v. Florida,* 405 U.S. 427,

Finally, Housman's confession was not cumulative of other, properly admitted, evidence. Although Appellant apparently harbored ill will toward White prior to the events in question, Housman's statement, as noted, constituted the only proof directly contradicting Appellant's rendition of what occurred in the trailer on the night of the murder. For these reasons, we are not convinced beyond a reasonable doubt that the error was harmless. Accordingly, Appellant's convictions relative to the charges of murder, kidnapping, and unlawful restraint must be set aside and the case remanded for a new trial.[14]

## IV. Appellant's other claims

Although we have determined that Appellant's Confrontation Clause claim requires a new trial, we deem it advisable, for the sake of judicial economy, to address two other claims which have been fully briefed and are capable of resolution on the present record, as they are likely to arise on remand. *See generally United States v. Adamson*, 665 F.2d 649, 656 n. 19 (5th Cir.1982) ("It is common practice for an appellate court to consider and decide issues which are fully presented and litigated and which will likely arise on retrial, even though such decision may not be necessary to support the narrow decision to reverse. The practice serves an important interest in judicial economy." (citation omitted)). Our analysis regarding the first such issue (duress) constitutes an alternative holding supporting the result reached. *See Commonwealth v. Swing*, 409 Pa. 241, 245, 186 A.2d 24, 26 (1962) ("Where a decision rests on two or more grounds equally valid, none may be relegated to the inferior status of obiter dictum.").[15]

431, 92 S.Ct. 1056, 1059, 31 L.Ed.2d 340 (1972); *Harrington v. California*, 395 U.S. 250, 254, 89 S.Ct. 1726, 1728, 23 L.Ed.2d 284 (1969); *Commonwealth v. Lee*, 541 Pa. 260, 272, 662 A.2d 645, 652 (1995); *Commonwealth v. Wharton*, 530 Pa. 127, 140, 607 A.2d 710, 717 (1992).

**14.** Appellant was also found guilty of theft and abuse of a corpse, and criminal conspiracy as to these offenses. These convictions are discussed below.

**15.** *See also* 21 C.J.S. Courts § 143 (observing that an "adjudication on any point within the issues presented by the case cannot be considered a dictum ... nor can an additional reason for a decision, brought forward after the case has been disposed of on one ground"); *Reyn-*

## A. *Duress instruction*

 First, Appellant maintains that the trial court erroneously refused her request for a jury instruction on the defense of duress. Duress is a defense to criminal culpability. *See Commonwealth v. Santiago*, 462 Pa. 216, 227–28, 340 A.2d 440, 446 (1975). It is codified in the Crimes Code as follows:

(a) **General Rule.**—It is a defense that the actor engaged in the conduct charged to constitute an offense because he was coerced to do so by the use of, or a threat to use, unlawful force against his person or the person of another, which a person of reasonable firmness in his situation would have been unable to resist.

(b) **Exception.**—The defense provided by subsection (a) of this section is unavailable if the actor recklessly placed himself in a situation in which it was probable that he would be subjected to duress. The defense is also unavailable if he was negligent in placing himself in such a situation, whenever negligence suffices to establish culpability for the offense charged.

18 Pa.C.S. § 309. Although at common law duress was not available as to a charge of first-degree murder, *see generally Commonwealth v. Morningwake*, 407 Pa.Super. 129, 140–41, 595 A.2d 158, 164 (1991), Section 309 does not create an exception for any particular offense. In drafting this provision-which replaces the common law test for duress, *see Commonwealth v. DeMarco*, 570 Pa. 263, 271, 809 A.2d 256, 261 (2002)-the General Assembly could have placed an express exception for murder into the statutory text, as some other states have done. *See, e.g.*, Mo. ANN. STAT. § 562.071(2)(1); *Commonwealth v. Robinson*, 382 Mass. 189, 415 N.E.2d 805, 813–14 & nn. 15–16 (1981) (collecting statutes). Because the Legislature chose not to include such an exception, we con-

olds–Penland Co. v. Hexter & Lobello, 567 S.W.2d 237, 241 (Tex.Civ. App.1978) (explaining that an "alternative holding" exists where the appellate court "rests its decision under the facts presented on two separate, but equally valid, grounds," whereas obiter dicta exists where "an appellate court decides a case on a specific ground based upon the facts of the case and, then assuming facts not before it, makes statements based upon the assumed facts").

clude that it did not intend to preserve the common law rule in this regard. *Cf. Commonwealth v. Brown*, 491 Pa. 507, 512 n. 2, 421 A.2d 660, 663 n. 2 (1980) (finding, as to the defense of protecting a third party, *see* 18 Pa.C.S. § 506, that the common law limitation on this defense to near relatives was abandoned under the Crimes Code where the Legislature did not expressly preserve that limitation). *See generally Poyser v. Newman & Co.*, 514 Pa. 32, 38, 522 A.2d 548, 551 (1987) (indicating that this Court generally refrains from engrafting onto a statutory provision an exception that does not appear in the text). Accordingly, the defense of duress is available in this Commonwealth as to a charge of first-degree murder.[16] The question remains, then, whether the trial court committed legal error or abused its discretion in removing the question of duress from the jury after the issue was properly raised. *See DeMarco*, 570 Pa. at 271, 809 A.2d at 260–61.

 The Constitution guarantees to state criminal defendants "a meaningful opportunity to present a complete defense." *Crane v. Kentucky*, 476 U.S. 683, 690, 106 S.Ct. 2142, 2146, 90 L.Ed.2d 636 (1986) (internal quotation marks omitted). Hence, "[w]here a defendant requests a jury instruction on a defense, the trial court may not refuse to instruct the jury regarding the defense if it is supported by evidence in the record," *DeMarco*, 570 Pa. at 271, 809 A.2d at 261; it is "for the trier of fact to pass upon that evidence and improper for the trial judge to exclude such consideration by refusing the charge." *Commonwealth v. Lightfoot*, 538 Pa. 350, 355, 648 A.2d 761, 764 (1994) (internal quotation marks omitted); *see also Commonwealth v. Borgella*, 531 Pa. 139, 142, 611 A.2d 699, 700 (1992) ("A defendant is entitled to an

---

**16.** This conclusion is in harmony with *Commonwealth v. Pelzer*, 531 Pa. 235, 612 A.2d 407 (1992) (plurality opinion), where the opinion announcing the judgment of the Court suggested that a defendant may, in an appropriate case, avail himself of the duress defense as to a charge of first-degree murder. *See id.* at 246–47, 612 A.2d at 413. Although the Superior Court has interpreted *Pelzer* as overruling *Morningwake*, *see Commonwealth v. Berger*, 417 Pa.Super. 473, 482–83, 612 A.2d 1037, 1042 (1992), the lead opinion in *Pelzer* did not express the view of a majority of this Court. Nevertheless, for the reasons stated above, we now reach the same determination as did the *Pelzer* plurality.

instruction on any recognized defense which has been request-
ed, which has been made an issue in the case, and for which
there exists evidence sufficient for a reasonable jury to find in
his or her favor."); *Commonwealth v. Weiskerger*, 520 Pa. 305,
312–13, 554 A.2d 10, 14 (1989) (same). In determining wheth-
er there is sufficient evidentiary support for a duress instruc-
tion, the trial court considers all evidence presented, whether
adduced by the defendant as part of her case in chief, through
cross-examination, or, "conceivably ... in the Common-
wealth's own case in chief." *DeMarco*, 570 Pa. at 271 n. 6, 809
A.2d at 261 n. 6 (internal quotation marks omitted).[17]

Here, Appellant's trial testimony set out at length
the basis for her claim of duress, including that Housman
repeatedly battered her and placed a knife to her throat or
side and threatened her with death if she did not do as he
instructed. These assertions have already been adequately
set out at length. They were, as explained, corroborated to
some degree by Appellant's neighbor, Deborah Baker, and
were also consistent with the testimony of two other wit-
nesses—one of whom had no connection to Appellant—who
observed Appellant's distraught condition on October 3, 2000,
the day before the homicide and, according to Appellant's
testimony, the day after the first full night of coercion and
terrorization by Housman. *See* N.T. 1177, 1180–81. We find
this evidence sufficient to raise a question of fact as to
whether Appellant was subjected to duress under Section
309(a), and thus, to confer upon Appellant a *prima facie*
entitlement to a jury instruction on the issue.[18]

17. The dissent maintains that, for the above purpose, the evidence must
be viewed in the light most favorable to the Commonwealth. *See*
Dissenting Opinion at 618. While that standard is appropriate to a
sufficiency analysis relative to the murder conviction (which we have
undertaken), it is inappropriate to the present inquiry, which focuses on
whether there was enough evidence for a reasonable jury to find in
Appellant's favor as to the asserted defense. *See Mathews v. United
States*, 485 U.S. 58, 63, 108 S.Ct. 883, 887, 99 L.Ed.2d 54 (1988);
*Borgella*, 531 Pa. at 142, 611 A.2d at 700; *Weiskerger*, 520 Pa. at 312–
13, 554 A.2d at 14.

18. To the extent other trial evidence was inconsistent with Appellant's
duress claim, and that she had initially lied to the police when she was

This does not end our analysis, however, because the trial court justified its refusal to give the requested charge on the grounds that the Section 309(b) exception applied. As set forth above, this exception precludes the defense where the actor recklessly places himself in a situation where duress is probable. *See* 18 Pa.C.S. § 309(b). For purposes of Section 309(b), recklessly is defined as follows:

A person acts recklessly with respect to a material element of an offense when he consciously disregards a substantial and unjustifiable risk that the material element exists or will result from his conduct. The risk must be of such a nature and degree that, considering the nature and intent of the actor's conduct and the circumstances known to him, its disregard involves a gross deviation from the standard of conduct that a reasonable person would observe in the actor's situation.

18 Pa.C.S. § 302(b)(3); *see DeMarco,* 570 Pa. at 273–74, 809 A.2d at 262.

Notably, it is the *trier of fact* that must determine whether the defendant acted recklessly. *See id.* at 274, 809 A.2d at 262. Thus, an appellate court will only affirm a trial judge's removal of the duress issue from the jury on the basis of the recklessness exception where there can be no reasonable dispute that this exception applies. In *Pelzer,* for example, the trial court refused to charge the jury on duress, holding that the Section 309(b) exception applied as a matter of law. A plurality of this Court agreed with that determination on the basis that the only evidence of duress at trial came from the defendant's own statement to the police, and, according to that information, during the crime the defendant left the scene entirely on multiple occasions and each time chose to

arrested in Virginia, this only indicates that the jury might have disbelieved her duress testimony. However, an instruction on a defense is not barred on the basis of a jury's potential disbelief. *See Borgella,* 531 Pa. at 142, 611 A.2d at 700; *cf. Commonwealth v. Kluska,* 333 Pa. 65, 67, 3 A.2d 398, 400 (1939) ("Unconvincing as defendant's explanation of the occurrence must have appeared to the jury, he was nevertheless entitled to have it presented for their consideration according to applicable principles of law.").

return. Thus, there was no room for reasonable disagreement that the defendant had voluntarily (and recklessly) placed himself in a situation in which duress was probable. *See Pelzer*, 531 Pa. at 248, 612 A.2d at 414; *accord DeMarco*, 570 Pa. at 275, 809 A.2d at 263 (summarizing the basis for the *Pelzer* plurality's conclusion, and indicating that the "evidence left no question" on the issue).

In *DeMarco*, on the other hand, this Court reversed the defendant's conviction where the trial court had, as in *Pelzer*, refused to instruct the jury on duress based upon the purported applicability of the 309(b) exception. The *DeMarco* Court determined that there was some basis to conclude that the defendant had acted recklessly, but that there was also evidence tending to negate recklessness. In that matter, DeMarco made statements to the police, and in court, corroborating the allegations of Frank Lawra that a third individual had vandalized Lawra's automobiles. After it became evident that these allegations were false, DeMarco was charged with several offenses, including perjury and false swearing. He defended himself by claiming that Lawra had coerced him into corroborating the latter's story. In support of this claim, DeMarco offered proof that he was borderline mentally retarded, and that Lawra had shot him with a B.B. gun, choked him, and threatened to deprive him of his social security checks or kill him if he did not comply. On the other hand, there was evidence that DeMarco failed to seek the assistance of law enforcement authorities in dealing with the alleged duress when he was in the presence of police officers. This Court concluded that this latter evidence raised the possibility that DeMarco was reckless in placing himself in a situation where duress was probable, but did not "ma[k]e it completely obvious, as in *Pelzer*, that that was the case." Thus, it was deemed a question of fact for the jury to determine whether DeMarco had acted recklessly. *See id.* at 275–76, 809 A.2d at 263–64.

The present case is more like *DeMarco* than *Pelzer*. Appellant's testimony and post-arrest statement provided evidence that she was subjected to duress by Housman during

and immediately prior to the kidnapping and homicide. This was corroborated in part by Deborah Baker's testimony, the two witnesses who observed Appellant's distraught condition, as well as Housman's conduct on October 2nd when he disabled Appellant's vehicle. On the other hand—and similar to *DeMarco*—Appellant failed to take advantage of potential opportunities to escape Housman's control. For example, while standing at the payphone, Housman had allegedly placed the knife back in his pocket; thus, Appellant may have been able to run into the store and ask that the police be called. Furthermore, after returning to her trailer, Appellant did not flee the scene when she went to the kitchen to obtain the cloth gag, when she and Housman went outside to smoke a cigarette, or when Housman was choking White and Appellant was close enough to the front door to run out of the trailer and seek help. *See* Trial Court op. at 85. As in *DeMarco*, these missed opportunities raise a question of fact as to whether Appellant acted recklessly. It cannot be overlooked, however, that there was also evidence to the effect that: Appellant had been subjected to terrorization, assaults, and death threats over a two-day period immediately prior to these events; she had already tried to escape through both the front and back doors of the trailer, and each time had been violently restrained from doing so by Housman; and Housman was at all relevant times in close proximity to Appellant and in possession of a hunting knife. These factors make this case qualitatively different from *Pelzer*, in which the defendant admitted that he had entirely removed himself from the alleged coercer's influence by leaving the scene and going to another house, and then had voluntarily returned to a location where he knew that a violent crime was in progress. We conclude, therefore, that there was conflicting evidence on the issue of whether Appellant was reckless, and thus, Appellant's actions did not remove the duress issue from the jury's purview.

The trial court also justified its conclusion that Appellant acted recklessly as a matter of law on the grounds that Appellant allowed Housman to move back into her trailer several weeks before the murder, although she was aware of

his violent tendencies, *see id.* at 79–80, and that she failed to escape Housman's domination after the victim was killed, *see id.* at 82–83. We find that, in the circumstances of this case, any connection between the offenses under review and Appellant's acts or omissions long before they occurred is too attenuated to provide a basis for removing the duress issue from the jury. Although one might argue that Appellant consciously disregarded a substantial and unjustifiable risk that she would be physically assaulted by Housman in the future, neither party contends that being the victim of domestic violence, in itself, suggests a probability of being coerced into victimizing a third party.[19] Moreover, there is no record

**19.** By its terms, Section 309(b) only applies if it was probable that the actor would be subject to duress as defined in Section 309(a), that is, that she would be coerced into "conduct charged to constitute an offense." (The common law similarly expressed the conditional nature of the defense as requiring "no reasonable opportunity to escape the threatened harm *except by committing the criminal act.*" *Morningwake,* 407 Pa.Super. at 140, 595 A.2d at 164 (emphasis added).) Accordingly, the recklessness exception is not implicated merely by the probability of becoming a victim of domestic violence; rather, the facts must encompass some probability of coercion to commit a criminal offense. In *Pelzer,* for example, the defendant was aware of ongoing criminal activity on the part of his confederates when he placed himself into circumstances in which it was probable that he would be coerced into participating. Similarly, in *Commonwealth v. Berger,* 417 Pa.Super. 473, 612 A.2d 1037 (1992), relied upon by the trial court here, the Superior Court found that the defendant was not entitled to raise the duress defense where it was uncontested that she stayed in her boyfriend's apartment for several hours while he (at her suggestion) left the apartment in search of a victim to bring back and kill. Thus, she failed to take advantage of an opportunity to escape in circumstances where she knew that a third party would likely be murdered. *See id.* at 483–84, 612 A.2d at 1042–43. Likewise, in *Commonwealth v. Baskerville,* 452 Pa.Super. 82, 681 A.2d 195 (1996), the defendant failed to take advantage of an opportunity to flee although he was aware that the alleged coercer planned to commit a crime. *See id.* at 86 n. 1, 681 A.2d at 197 n. 1.

We acknowledge that, under some circumstances, placing one's self into a certain cooperative relationship with other violent individuals may constitute recklessness, even where no specific crime is in view. For example, the court in *People v. Anderson,* 28 Cal.4th 767, 122 Cal.Rptr.2d 587, 50 P.3d 368, 374 (2002), suggested that the duress defense may be unavailable to a person who joins a street gang or prison gang and is then coerced to commit a crime. *See also Williams v. State,* 101 Md.App. 408, 646 A.2d 1101, 1110 (1994) (finding that, because of defendant's voluntary involvement with a drug ring, he

basis to think that Appellant would have had reason to believe, as early as mid-September of 2000, that Housman was forming any plans to victimize Leslie White; rather, her suspicions, if anything, were directed to the possibility that Housman might try to resume his relationship with White.

As for Appellant's post-offense conduct, the trial court concentrated primarily on Appellant's failure to run for help when she left the trailer to retrieve the tent, as well as her failure to drive to a police station and report the crime when following Housman en route to Virginia after the crime was completed. While these omissions may provide circumstantial evidence of recklessness at the time of the kidnapping and murder, we note that Section 303(b), by its terms, focuses upon the acts or omissions of a defendant in placing himself into a duress situation in the first instance. The evidence of Appellant's actions contemporaneous with the offenses, as noted, was in conflict. Thus, under these circumstances, Appellant's failing to withdraw from efforts to cover up the completed crimes after they occurred do not constitute a firm enough basis to remove the question of duress from the jury.

Accordingly, the jury should have been informed of the elements of the defense of duress and its recklessness exception, and allowed to resolve these factual issues-at least with respect to the charges of homicide, kidnapping, and unlawful restraint.[20]

### B. *Lassiter instruction*

 In the penalty phase Appellant requested a jury instruction pursuant to this Court's decision in *Commonwealth*

could not raise the duress defense although he was abducted by three men and coerced to engage in criminal activity to repay a drug debt). This was not the case here, however, because, although Housman allegedly had violent tendencies, there was no indication that his ordinary pattern of behavior included coercion to commit crimes as to third persons.

**20.** This holding is based upon the evidence presented during Appellant's first trial. Upon retrial, the court will, of course, have to assess the proof adduced, in light of the principles discussed above, to determine whether or not to grant any defense request to instruct the jury on duress at that proceeding.

*v. Lassiter,* 554 Pa. 586, 722 A.2d 657 (1998) (plurality). Specifically, she asked that the trial court inform the jury that the only aggravating circumstance put forward by the Commonwealth—that the homicide had occurred during the perpetration of the felony of kidnapping, *see* 42 Pa.C.S. § 9711(d)(6)—does not apply to an individual found guilty of first-degree murder as an accomplice.[21] The trial court denied this request and explained in its opinion that the instruction was unwarranted because the jury did not specifically indicate that it found Appellant guilty as an accomplice. *See* Trial Court op. at 101.

Appellant correctly claims that the trial court's reasoning was in error. The trial court included a charge on accomplice liability in its guilt-phase instructions.[22] It also presented a general verdict form to the jury and never requested that the jury indicate whether its finding of guilt was based upon principal or accomplice liability. Further, in the alternative to his arguments concerning principal liability, the prosecutor also argued that the jury should convict Appellant as an accomplice.[23] It is possible, therefore, that the jurors convicted Appellant as an accomplice, as they had plainly been authorized and invited to do. Hence, the trial court incorrect-

---

**21.** In *Lassiter* six Justices joined the Court's central holding that the General Assembly did not intend the (d)(6) aggravator to apply to accomplices, although the remainder of the lead opinion only garnered the support of a plurality of justices.

**22.** Specifically, the court informed the jurors that they could find Appellant guilty of a crime without finding that she personally engaged in the conduct required for the commission of the crime, so long as they were satisfied that, with the intent of promoting or facilitating the crime, she solicited, commanded, requested, encouraged or agreed with the other person in planning or committing it. *See* N.T. 1209–10.

**23.** *See* N.T. Vol. IV, at 93, 101 (reflecting the prosecutor's argument to the jurors that: "I want you to consider accomplice liability.... [T]he law says, if you slightly help another person do an act, you are as guilty as they are."); *id.* ("So you note it in like Ms. Markman's statement that ... it was not me, I didn't kill her. Oh, that gets me off cause I am not the one that physically did it ... You are aiding and abetting in that particular act ... You are in. And you are in for all of it at that point."); *id.* at 117 ("And, yeah, you can be an arm's length away while you are holding that girl down while he finishes her off. And that makes you an accomplice."); *id.* at 127 (reflecting additional argument by the district attorney concerning accomplice liability).

ly characterized the requested clarification as irrelevant. *Accord Commonwealth v. Spotz*, 587 Pa. 1, 80 n. 36, 896 A.2d 1191, 1238 n. 36 (2006) (finding that, where the defendant's first-degree murder conviction was a general verdict that could have been predicated on accomplice liability, *"Lassiter* would have required the trial court to instruct the jury at the sentencing phase that the jury would first have to find that [the defendant] himself brought about the killing before it could find" the Section 9711(d)(6) aggravating circumstance).[24]

Nevertheless, this case is different from some others in which the *Lassiter* issue has surfaced in that the trial court specifically instructed the jurors that the (d)(6) aggravator applied only if "the defendant committed a killing while in the perpetration of a felony." N.T. 1442. This is materially distinguishable from situations in which trial courts have paraphrased the (d)(6) aggravating circumstance in the passive voice (*e.g.*, by indicating that the aggravator applies where the "killing was committed in the perpetration of a felony"), thus conveying that a defendant's actual perpetration of the killing is immaterial. By tracking the language of the statute, the trial court in the present case conveyed the essential information in an understandable form.

In summary, the court erred in refusing to clarify that the (d)(6) aggravating factor does not apply to an accomplice who does not actually perpetrate the killing, upon Appellant's reasonable request, on the basis that this was irrelevant. Nevertheless, in view of the (d)(6) instruction actually given, a new penalty proceeding would not presently be required on the *Lassiter* claim.

## V. Appellant's other convictions

As discussed, Appellant was also found guilty of theft and abuse of a corpse. *See supra* note 14. However, she does not presently raise any specific challenge to these convictions.

---

**24.** Although *Spotz* was a plurality as to some issues, a majority of the Justices agreed that the trial court's failure to provide a *Lassiter* charge was inconsistent with the fact that the defendant might have been found guilty as an accomplice.

For example, she does not claim that she was coerced into committing these crimes or that the *Bruton* error infected these convictions. Rather, her arguments concerning both duress and *Bruton* are directed solely to the events leading up to the killing of Leslie White. The abuse of White's corpse and the stealing of her vehicle and camera were committed during a distinct time frame after the kidnapping and killing were complete. This is significant for both the duress and *Bruton* issues because Appellant never claimed to be under duress during this latter interval, and in any event, Appellant had several clear opportunities to escape Housman's alleged domination after the killing, including when she left the trailer alone to retrieve the tent, when she followed Housman to Virginia in a separate vehicle, and when she sat in Officer Vaughn's patrol car after Housman had gone back into his father's house. *See* Trial Court op. at 82–83.

The only general claim raised by Appellant which, if successful, would undermine the validity of these convictions, is that the trial court's jury-unanimity instruction was ambiguous. In the guilt phase, the court charged the jury as follows:

All votes are equal on the jury, ladies and gentlemen. I remind you to put something on the slip, your verdict must be unanimous. And obviously that means each one of you must agree to it before you put it down on a slip.

N.T. 1231. Trial counsel later unsuccessfully requested that the judge inform the jurors in more detail concerning the requirement of unanimity by including a portion of Appellant's suggested charge. *See id.* at 1233.

Appellant argues that the above instruction constituted error, as it failed to clarify that each juror must individually agree that the verdict reached is an appropriate one. She states that her suggested instruction tracked Pennsylvania's standard instruction which, in addition to the above, includes the following admonition:

Each of you must decide the case for him- or herself, but only after there has been impartial consideration with your fellow jurors. In the course of deliberations, each juror

should not hesitate to re-examine his or her own views and change his or her opinion if convinced it is erroneous. However, no juror should surrender an honest conviction as to the weight or effect of the evidence solely because of the opinion of his or her fellow jurors, or for the mere purpose of returning a verdict.

Pennsylvania Standard Jury Instruction 7.05 (Crim). Appellant maintains that, without the above clarification, the charge left open the possibility that a juror might agree to a verdict simply because the court had directed that any verdict must be unanimous—as opposed to the juror agreeing to the verdict as a result of his or her honest opinion.

A trial court has broad discretion in phrasing its charge, and will only be found to have erred where there is an abuse of discretion or an inaccurate statement of the law. *See Commonwealth v. Hall,* 549 Pa. 269, 303, 701 A.2d 190, 207 (1997). Where an instruction is alleged to be ambiguous, the standard for review is whether there is a reasonable likelihood that the jury applied it in a manner that violates the Constitution. *See Estelle v. McGuire,* 502 U.S. 62, 72, 112 S.Ct. 475, 482, 116 L.Ed.2d 385 (1991). Here, the trial court plainly stated that each juror must agree to the verdict before it can become a verdict. Thus, Appellant's argument that the jury might have misunderstood the meaning of unanimity is highly speculative and, as well, contrary to the judge's express statement that all votes carry equal weight. In short, Appellant's claim is insufficient to raise a reasonable probability that the jury misapplied the instruction. Accordingly, the trial court's unanimity charge did not constitute reversible error.

## VI. Conclusion

For the reasons stated, we affirm the judgment of sentence insofar as Appellant was found guilty of theft, abuse of a corpse, and criminal conspiracy to commit those offenses. We vacate the judgment of sentence in all other respects, and remand the matter for further proceedings consistent with this Opinion.

Chief Justice CAPPY, Justice CASTILLE and BAER and Justice BALDWIN join the opinion.

Justice EAKIN files a dissenting opinion.

Justice EAKIN, dissenting.

I am constrained to disagree with the majority on three points.

First, the majority concludes the trial court committed reversible error by allowing the jury to listen to a redacted audiotape of Housman's statement to the police, which implicated appellant in the murder. It was apparent the tape was redacted; the phrase "the other person" was dubbed, in a different voice, over each of Housman's references to "Beth," "Markman," and each feminine pronoun. I agree it was error to allow the jury to hear this tape; as redacted, it violated *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). However, the United States Supreme Court has rejected the notion that the erroneous admission of an incriminating statement by a co-defendant at a joint trial automatically requires reversal of a conviction. *See Harrington v. California*, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969); *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). On several occasions, the Court has deemed violations of confrontation rights to be harmless error. *See Brown v. United States*, 411 U.S. 223, 93 S.Ct. 1565, 36 L.Ed.2d 208 (1973) (violation of confrontation rights harmless beyond reasonable doubt where improper evidence merely cumulative of overwhelming evidence of guilt); *Schneble v. Florida*, 405 U.S. 427, 92 S.Ct. 1056, 31 L.Ed.2d 340 (1972) (*Bruton* violation harmless beyond reasonable doubt since overwhelming evidence of guilt outweighed comparative insignificance of confession); *Harrington, supra* (overwhelming evidence of guilt and relatively insignificant prejudicial impact of co-defendant's statement rendered *Bruton* violation harmless). Here, despite the *Bruton* violation, I find admission of the improperly redacted confession was harmless in light of the overwhelming properly admitted evidence establishing appellant's guilt.

The majority cites *Commonwealth v. Young,* 561 Pa. 34, 748 A.2d 166, 193 (1999), in support of its conclusion that the prejudicial effect of Housman's statement was not harmless. Majority Op. at 278, 916 A.2d at 603 (citing *Young,* at 193). In that case, Young and three others were under investigation for their involvement in a fraud scheme. A co-conspirator agreed to testify against Young and the others, but a few days before the scheduled testimony, he was murdered; Young and the others were charged with murder as co-defendants.

At trial, Young denied any involvement in planning or executing the murder, and presented an alibi and other evidence in support of that claim. The Commonwealth presented the statements of Young's two non-testifying co-defendants, which alleged Young planned and committed the murder. We concluded the admission of these statements violated the Confrontation Clause, then examined whether the error was harmless. We found it was not:

> It is beyond cavil that this case does not present a situation where the erroneously admitted evidence was not prejudicial to [Young]. [The co-defendants'] statements specifically identified [Young] as [the victim's] murderer. *It is difficult to imagine any evidence more prejudicial to a defendant than that which identifies [him] as a perpetrator of a capital crime.*

*Young,* at 193 (emphasis added).

In *Young,* the identity of the killer was not known, and Young denied having any role in either the planning of the murder or the murder itself. His co-defendants' statements completely and directly contradicted every aspect of Young's testimony. In the present case, however, there was no question about the identity of the killers; Housman and appellant both admitted they murdered White. The reasoning from *Young* that the majority cites is not determinative.

We must remember appellant took the stand and identified herself as the perpetrator of a capital crime; any prejudice to her from the introduction of Housman's improperly redacted confession is qualitatively distinct from the prejudice caused

by the statements in *Young.* This comports with the United States Supreme Court's analysis of the prejudicial impact of a co-defendant's statement in a joint trial where, as here, the defendant has confessed to involvement in the crime:

> [T]he incriminating statements of a co-defendant will seldom, if ever, be of the "devastating" character referred to in *Bruton* when the incriminated defendant has admitted his own guilt. The right protected by *Bruton*—the "consititutional right of cross-examination," ... has far less practical value to a defendant who has confessed to the crime than to one who has consistently maintained his innocence. Successfully impeaching a co-defendant's confession on cross-examination would likely yield small advantage to the defendant whose own admission of guilt stands before the jury unchallenged.

*Parker v. Randolph,* 442 U.S. 62, 73, 99 S.Ct. 2132, 60 L.Ed.2d 713 (1979) (plurality opinion), *abrogated by Cruz v. New York,* 481 U.S. 186, 107 S.Ct. 1714, 95 L.Ed.2d 162 (1987).

We must also be mindful that it was not the admission of the statement itself that was error—it was the ineffectual means of redaction that alone created error. We must assess the harm not of the statement, but of the improper redaction. This redaction produced a tape with obvious deletions and alterations, which the United States Supreme Court has held is the equivalent of naming the defendant.[1] Thus it was error, pursuant to *Bruton,* to admit Housman's confession as redacted; it would not have constituted error if the confession had merely been read into evidence, or redacted in a way that did not produce obvious alterations.

This error had little impact since the prejudice caused by admission of the improperly redacted confession is no more than the prejudice that would have resulted from a properly redacted confession.[2] Appellant and Housman were the only two people charged with the murder, they were tried together

1. *See Gray v. Maryland,* 523 U.S. 185, 195–97, 118 S.Ct. 1151, 140 L.Ed.2d 294 (1998).

2. Indeed, at a joint retrial, one must assume a properly redacted statement would be admitted, and there would be no *Bruton* violation.

at a joint trial, and the jury listened as appellant testified that she and Housman killed White, fled to Virginia together, and were subsequently arrested. Under the circumstances, the jury would surely be aware who "the other person" was, no matter how obvious or discrete the redaction. This error caused little prejudice beyond the prejudice of the statement itself, and admitting that statement (properly redacted) was not error.

The majority concludes the admission of Housman's improperly redacted confession caused substantial prejudice to appellant since it was the only proof directly contradicting her claim she was forced to participate. Majority Op. at 278–79, 916 A.2d at 603. However, the majority bases its analysis on the prejudicial impact of Housman's confession as a whole, rather than focusing on the prejudice caused by the error—*i.e.,* the method of redaction. Had there been appropriate redaction, this statement would have been admissible. Under the circumstances, I find the prejudicial impact of the error was *de minimis.*

In addition, there was overwhelming evidence of guilt, and the relatively insignificant prejudicial impact of Housman's statement rendered the *Bruton* violation harmless. The evidence showed appellant made threats to third parties that she would kill White. She said she would "kick her ass" if they ever met. She called White at work to harass her. Appellant drove Housman to the Sheetz store to lure White back to the trailer. She waited for White to arrive, knowing White was coming under false pretenses. She hid quietly in the bedroom until she emerged and blocked the front door. She tied White's hands and feet together. She shoved a rag into her throat and gagged her. She accompanied Housman outside to smoke a cigarette and plan their next move. She held the victim's body while Housman strangled her; when she was arrested, she had scratches on her neck which she admitted were caused by White in the struggle. After White was dead, appellant left the trailer alone and returned with a tent in which to hide the body.

Appellant followed Housman all the way to Virginia, driving a separate vehicle and continuing to forgo the constant oppor-

tunity to flee or seek help. In Virginia, she helped hide White's body and dispose of her personal effects. Appellant told Nina Jo Fields, a friend they visited in Virginia, that Housman had been cheating on her, but that she "[didn't] have to worry about the damn bitch anymore, [because she] took care of it." N.T. Trial, 10/26/01, at 322. In one of the pictures taken with White's camera a few days after the murder, appellant is laughing while Housman pretends to choke her.

The circumstances of this case are more akin to those in *Commonwealth v. Groff*, 356 Pa.Super. 477, 514 A.2d 1382 (1986), wherein the Superior Court found the erroneous admission of a tape-recorded emergency telephone call made to police was harmless error. The court stated:

> The undisputed facts ... provide overwhelming evidence of an intentional killing. Murder of the first degree is an "intentional killing," ... one that is "willful, deliberate and premeditated." ... The appellant's preparation, lying in wait and entering the house with a loaded weapon are events which, even individually considered, are evidence of premeditation and, taken together, are overwhelming proof of appellant's intent to take the life of his estranged wife.
>
> The only evidence to support appellant's theory of "heat of passion" was his own self-serving testimony that he shot his wife after she started "screaming and hollering."

*Id.*, at 1385 (citations omitted). Similar to the appellant in *Groff*, the only evidence to support appellant's defense is her own self-serving testimony that she was coerced into participating in the killing. Appellant's actions and her failures to act provided the jury with overwhelming proof to the contrary and shows that she intended to take the life of her boyfriend's mistress, thereby eliminating the source of the problems in their relationship. Any prejudice caused by the method of redaction of Housman's statement was insignificant in comparison, and I would hold the error in admitting it was harmless.

Next, while I agree with the majority's determination that duress is available in Pennsylvania as a defense to first degree murder, I disagree with the majority's conclusion that the trial

court erred in refusing to instruct the jury on duress in this case.

Duress is a statutory defense, set forth at 18 Pa.C.S. § 309:

(a) General rule.—It is a defense that the actor engaged in the conduct charged to constitute an offense because he was coerced to do so by the use of, or a threat to use, unlawful force against his person or the person of another, which a person of reasonable firmness in his situation would have been unable to resist.

(b) Exception.—The defense provided by subsection (a) of this section is unavailable if the actor recklessly placed himself in a situation in which it was probable that he would be subjected to duress.

*Id.*

The exception under § 309(b) applies if the actor recklessly places himself in a situation where duress is likely. The trial court stated even if appellant's proffered evidence was sufficient to establish the elements of duress—and the court determined it was not—appellant was nevertheless precluded from asserting that defense since even accepting her self-serving testimony, the only evidence thereof, it was clear she recklessly and repeatedly placed herself in a situation where any actual duress was likely.

An appellate court will only affirm a trial court's removal of the duress issue from the jury on the basis of § 309(b) in a case where there can be no reasonable dispute that this exception applies. *Commonwealth v. DeMarco*, 570 Pa. 263, 809 A.2d 256, 261 (2002). I would hold this is such a case. For purposes of determining whether a defendant "recklessly" placed himself in a situation where duress was probable, the Crimes Code provides:

A person acts recklessly with respect to a material element of an offense when he consciously disregards a substantial and unjustifiable risk that the material element exists or will result from his conduct. The risk must be of such a nature and degree that, considering the nature and intent of the actor's conduct and the circumstances known to him, its

disregard involves a gross deviation from the standard of conduct that a reasonable person would observe in the actor's situation.

18 Pa.C.S. § 302(b)(3).

Here, appellant claimed Housman cut her and kept her hostage inside the trailer for two days prior to the murder. However, when Debbie Baker, her friend and neighbor, knocked on the door the day before the murder, appellant freely left the trailer to speak with her. The two walked to Baker's home and talked on the porch for about two hours. N.T. Trial, 10/30/01, at 859–60. Baker testified appellant told her Housman had been "terrorizing" her inside the trailer, but when Baker urged appellant to stay with her, appellant stated she wanted to return to the trailer; she got up and walked to the trailer and went back inside. *Id.;* N.T. Trial, 10/31/01, at 990–95.

The next day, appellant drove Housman to the Sheetz store and stood beside him as he placed the deceptive phone call to White. She was in a public place, yet she made no attempt to escape from Housman or leave him behind. Instead, she got back into the car with him and drove him back to the trailer to meet White. When they turned into the trailer park, appellant drove past Sandra Kautz, the park manager; she did not attempt to get Kautz's attention or seek help. Ms. Kautz testified she raised her hand to wave to the couple, but neither of them acknowledged her. N.T. Trial, 10/25/01, at 167–68. Appellant parked the car and reentered the trailer with Housman.

When White arrived, appellant hid in the bedroom with the door closed; she did not try to escape through the back door, nor did she yell or make noise to alert White of her presence in the trailer. Appellant remained quietly concealed in the bedroom until she emerged and sat by the front door. She left the trailer with Housman to smoke, but she never cried out to her neighbors or made any attempt to flee. Instead, she stayed at Housman's side and reentered the trailer with him to complete the murder. She did not flee when Housman

was busy strangling White, despite being less than five feet from the door.

After White died, appellant left the trailer, once again alone, to get the tent; instead of taking that opportunity to run from Housman or to get help, she returned to the trailer with the tent and helped Housman hide the body and cover up the crime. Housman drove the Jeep to Virginia with White's body in the trunk, and appellant followed him for the entire five-hour drive in her own vehicle; not once did she attempt to lose Housman or call the police. When asked at trial why she never tried to escape on the way to Virginia, appellant tellingly replied, it "never crossed my mind." N.T. Trial, 10/31/01, at 1021. When she was being questioned by the officer who was investigating the missing persons report, appellant again forwent an opportunity to confess the crime and escape Housman's control. I would hold the above evidence is sufficient to establish, without question, appellant acted recklessly at the very least.

The only direct evidence that appellant acted under duress was her own testimony. To corroborate this testimony, appellant presented the testimony of Debbie Baker and two other witnesses who testified they saw appellant sitting on the porch with Baker the day before the murder, and that it was apparent appellant had been crying.

On appeal, this Court must view the evidence in the light most favorable to the verdict winner. *Commonwealth v. Watkins*, 577 Pa. 194, 843 A.2d 1203, 1211 (2003). The majority fails to abide by this principle, and places an inordinate amount of weight on the testimony of Debbie Baker, appellant's lifelong friend and neighbor. In accordance with our standard and scope of review, Baker's testimony should be granted little credit on appeal since the Commonwealth directly challenged Baker's credibility and veracity at trial. *See* N.T. Trial, 11/1/01, at 107–09, 120–21. The testimony from the other two witnesses who testified they saw appellant crying on Baker's front porch is of little relevance to the issue of duress, and the same is true of the evidence that Housman had disabled appellant's vehicle. *See* Majority Op. at 283–86, 287,

916 A.2d at 607–608, 609. Considering the nature and intent of appellant's conduct and the circumstances known to her, the above testimony is insufficient to overcome the consistent evidence that appellant acted recklessly.

When viewed in the light most favorable to the Commonwealth as verdict winner, the evidence leaves no question that, even if Housman threatened her, appellant acted recklessly and repeatedly placed herself in situations where it was probable she would be subjected to duress. I would hold that as a matter of law, the defense of duress was not available to appellant pursuant to § 309(b), and therefore, it was proper for the trial court to refuse to charge the jury on duress.

Finally, I disagree with the majority's determination that the trial court erred in refusing to provide the jury with a *Lassiter*[3] instruction. In that case, we held the subsection (6) aggravator is inapplicable "to accomplices *such as [Lassiter]*," *i.e.,* defendants who are not the causal agent directly responsible for performing the murder. *Id.* However, appellant is not an "accomplice *such as Lassiter*" since she and Housman were both directly responsible for performing the murder. A closer reading of *Lassiter* shows our holding did not turn on Lassiter's status as an accomplice, but was instead premised on the fact that the Commonwealth's theory of the case was that Carter, not Lassiter, shot the victim. We held the subsection (6) aggravator was thus inapplicable to Lassiter since she was not one who "committed" a killing. Thus, the critical inquiry is not whether the jury's verdict was based on accomplice or principal liability, but rather, whether the defendant "committed" the murder.

Here, the jury did not indicate whether its verdict was based on accomplice or principal liability, but when viewed in the light most favorable to the Commonwealth as verdict winner, the evidence clearly establishes appellant is not a mere non-committing accomplice "such as Lassiter;" the Com-

3. *Commonwealth v. Lassiter,* 554 Pa. 586, 722 A.2d 657, 661–62 (1998), held the aggravating circumstance at § 9711(d)(6) is inapplicable to one who is found guilty of first degree murder as an accomplice, but not as the actual killer.

monwealth's theory at the guilt phase was that appellant and Housman committed the killing together. Lassiter may have been criminally responsible for the murder, but she did not "commit" the act which killed the victim. We held § 9711(d)(6) may not be applied to an accomplice who does not commit the killing in the sense of bringing it to completion. *Lassiter*, at 661.

However, our holding did not address an accomplice who *does* commit the killing. *Lassiter* noted the distinction between "one who commits a killing" and "an accomplice to murder," but it did not hold those two designations are mutually exclusive.

The basis for the jury's conviction of first degree murder is irrelevant to the Commonwealth's burden of proof at the guilt phase. Whether principal or accomplice, the Commonwealth had to prove the actual commission of the killing, not merely accomplice liability. The court clearly instructed the jury that it was the Commonwealth's burden to prove the aggravating circumstance beyond a reasonable doubt, which includes a finding that appellant *committed* the killing.[4] Where the Commonwealth proves at the penalty phase that the defendant committed a killing by performing an act that directly caused the victim's death, the defendant is not immune from application of the subsection (6) aggravating circumstance, regardless

4. The court stated, "[i]n this case, in each verdict, under the sentencing code, only the following matters, if proven to your satisfaction *beyond a reasonable doubt,* can be considered aggravating circumstances. That circumstance would be the same in [both appellant's and her co-defendant's] case. *That the defendant committed a killing* while in the perpetration of a felony, in this case, kidnapping." N.T. Sentencing, 11/5/01, at 1442 (emphasis added). "In deciding whether aggravating or mitigating circumstances exist . . . you should consider the evidence and the arguments offered by both the Commonwealth and each defendant. This includes the evidence that you heard during the earlier trial, and any statements [at the penalty phase]." *Id.*, at 1444. "When voting on the general findings, you are to regard a particular aggravating circumstance as present only if you all agree that it is present." *Id.*, at 1446. "Remember, the *Commonwealth must prove any aggravating circumstance beyond a reasonable doubt.*" *Id.*, at 1447 (emphasis added).

of whether the guilt phase verdict is based on accomplice or principal liability.

For the foregoing reasons, I respectfully dissent.