J-S07029-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| WILLIAM TERRY LEDFORD | |
| Appellant | No. 966 MDA 2013 |

Appeal from the Judgment of Sentence of December 6, 2012
In the Court of Common Pleas of Huntingdon County
Criminal Division at No.: CP-31-CR-0000260-2011

BEFORE:  MUNDY, J., WECHT, J., and FITZGERALD, J.[*]

MEMORANDUM BY WECHT, J.:                          **FILED AUGUST 05, 2014**

William Ledford appeals his December 6, 2012 judgment of sentence. We vacate the judgment of sentence and remand for a new trial.

On September 25, 2012, following a jury trial, Ledford was convicted of aggravated assault[1] and recklessly endangering another person ("REAP")[2] for a shooting incident that occurred on May 11, 2011 in Huntingdon Borough, Pennsylvania.  In its opinion denying Ledford's post-sentence motions, the trial court provided the following summary of the facts underlying Ledford's convictions:

---

[*]    Former Justice specially assigned to the Superior Court.

[1]    18 Pa.C.S. § 2702(a)(1).  The jury acquitted Ledford of criminal attempt—criminal homicide, 18 Pa.C.S. §§ 901, 2501.

[2]    18 Pa.C.S. § 2705.

The event giving rise to this prosecution occurred in the late afternoon of May 11, 2011, at an apartment building at 1211 Mifflin Street, Huntingdon, Pennsylvania.

Patrolman Adam McBride, a four (4)[-]year veteran of the Huntingdon Borough Police Department, testified [that] he was working the 5:00 p.m. to 3:00 a.m. shift that day and was dispatched to investigate gunshots at the 1211 address. The officer proceeded to the address and parked his patrol car on Mifflin Street in front of 1211, an apartment building owned by [Ledford's] family. While he was in the process of notifying dispatch that he had arrived, [Ledford] appeared at the window [of Officer McBride's] car. Officer McBride described [Ledford] as "excited, very paranoid" and was repeating "he's in there, he's in there, he shot my friend." The officer testified that [Ledford] told him he was referring to Jeremiah Shoop who throughout the trial was referred to as "Miah." McBride [testified that] he was familiar not only with [Ledford] but also Miah Shoop.

McBride testified [that] he followed Ledford into the building where Ledford showed him a door that led downstairs. [Ledford] told [Officer McBride that] Shoop was downstairs. Thinking it wasn't a good idea to go down to the basement alone, McBride asked if there was another way to get in. Ledford, he said, took him around the side of the house and showed him a door and stairway to the basement.

Security personnel from nearby Juniata College arrived and backed up Officer McBride as he entered the building with gun drawn.

Going down the stairs, Officer McBride said he immediately smelled gun powder. To the right of the stairway the officer said he saw a door with a large number of bullet holes exiting out into the hallway. There was, he said, a belt through the doorknob hole securing the door.

Officer McBride made entry into the basement apartment. He immediately encountered Rex Cuff and Dustin Scott. Also to his right, he saw Josh Lemin lying on the floor with a wound that was bleeding. [Officer] McBride knew all these young men. [Ledford], who was behind [Officer] McBride, ran to Lemin. Officer McBride cleared all the other rooms to make certain [that] Miah Shoop was not there since he had every reason to believe Mr. Shoop, whom he believed to be the shooter, was still there.

[Officer] McBride retrieved his personal trauma kit from his patrol car and began to administer first aid to Lemin. Soon thereafter EMS arrived and took over treatment of Lemin.

The officer described the wound to Lemin's arm as severe, and he said he found shotgun wadding inside the fabric of [Lemin's] clothing. Lemin, he said, was screaming in pain.

McBride reported that he saw a Judge revolver near Lemin's hand. He picked it up, [] cleared it and set it aside. Since he observed a lot of shell casings in different calibers on the floor, he asked [Ledford] if there were other weapons. Ledford retrieved two (2) from a back bedroom. The officer cleared both weapons and found no rounds. The weapons in the apartment were 1) a Tarus Judge model revolver; 2) a Sportsman 12 auto 12[-]gauge shotgun; and 3) a Sega SKS style .223 semi-automatic rifle with scope.

Officer McBride said he questioned [Ledford] and was told [that] Miah Shoop was responsible for the scene he found that afternoon. [Ledford] related that Mr. Shoop shot and they shot back.

EMS removed Lemin and Officer McBride moved all the players outside where other Huntingdon Borough officers were waiting. Thereafter, McBride assisted in the collection of evidence.

John C. Stevens, a twenty-seven (27)[-]year veteran of the Huntington Borough Police Department, testified [that] he interviewed [Ledford] on May 11 at the police offices. He had known [Ledford] since he was ten (10) or eleven (11). *Miranda* rights were administered, and the statement was recorded and played at trial. It lasted an hour and provided listeners with an appreciation for the effects of bath salts on users.

On May 11[, Ledford] related that he was living in the small basement apartment at 1211 Mifflin Street. His roommate was Josh Lemin. His best friend, Dustin Scott, lived several doors further up Mifflin Street.

On the days leading to May 11, Ledford said that he and Scott were experimenting with bath salts. On May 11, the evidence in the case was unequivocal that all three (3) – Ledford, Scott, Lemin – were using the salts prior to the events which brought Officer McBride to the apartment. For reasons that are anything but clear, on May 11, [Ledford] and his friends were convinced

that Miah Shoop and his friends were going to come to the apartment to take their bath salts by force. [Ledford] told Officer Stevens that a "war meeting" was held to plan resistance to the assault the trio believed was imminent. Rex Cuff, a friend of all the players in this event, arrived late in the afternoon and involuntarily became a participant. No evidence indicated the use of bath salts by Cuff.

[Ledford] related a phone call from Shoop and his warning to Shoop to not come over, to leave them alone. Yet he said "I knew that they were going to try to get me tonight. I knew it in my soul because they knew I had a safe."

[Ledford] said [that] they barricaded [themselves] inside the apartment by using belts to secure the knobless door. Rex, he said, started getting calls from Garrett Steele, and then, he said, "all of a sudden the belt strap started tightening like real slowly a bit at a time." Out the back window (the only window in the apartment), [Ledford] told Stevens [that] he saw two (2) guys climb out of a dark SUV and retrieve weapons from the back of the vehicle. He said he could hear Miah taunting him to come outside and the yanking on the door was becoming harder. [Ledford] said he had the "AK" and fired four (4) warning rounds into the floor joists. [Scott], he said, fired a warning shot from the Judge.

Subsequently, Scott obtained the shotgun, and Lemin, the Judge revolver. The description of the subsequent shooting inside the apartment was difficult to understand[,] but when the shooting was over, Josh Lemin had been shot in his arm with the shotgun.

[Ledford] told Officer Stevens that the guns were all his, and that Scott and Lemin followed his orders that afternoon. He readily accepted responsibility for Josh [Lemin] getting shot but insisted that they had to defend themselves.

Jeremiah Shoop, 32, testified [that] he knew [Ledford] on May 11 since he was a friend of his friend, Dustin Scott. He acknowledged knowing Josh Lemin and Rex Cuff as well. He never, he said, had a problem with any of these guys until that day.

[Shoop testified that, on May 11, he had] multiple phone conversations with Dustin [Scott]. At one point, he said he talked to [Ledford]. They told him, he said, to come down. It seemed, he said, like he was being goaded into going to 1211.

He went to 1211. He testified [that] he wanted to get to the bottom of it. He took a friend but no weapons. In fact, he denied owning any guns. He knew [that] they had weapons. He said he didn't go looking for a fight but rather to talk things out, to find out what the problem was.

Shoop testified [that] he never entered the building but yelled down the steps. There was a lot of yelling back and forth, he said, but no shooting. This dialogue lasted [] five (5) minutes[,] after which he left and went home. On his way he said he heard two (2) bangs.

Trooper Charles Stitt has worked full[-]time since 1996 in the forensic services unit of the Pennsylvania State Police. He arrived at 1211 Mifflin Street on May 11 at 5:40 p.m. and began collecting evidence at 7:32 p.m. after a search warrant had been secured. He finished at 12:55 a.m.

Trooper Stitt testified [that] he collected at the scene fourteen (14) .223 caliber shells, four (4) []12 gauge shotgun shells and one (1) [.]45 caliber shell or nineteen (19) spent casings. He also testified [that] he found no evidence that any shots had been fired from outside the apartment into the apartment. He also said he found no evidence that shots had been fired into the floor joists.

Shelby Richard Flasher testified [that] he lived in the upstairs apartment at 1211 Mifflin and that [Ledford] was his landlord. He said he considered [Ledford] a friend and said he also knew Dustin Scott. On May 11 in the late afternoon (4:30/5:00), Flasher testified he was outside his apartment on the porch to smoke. He said he saw Jeremiah Shoop kneeling outside the door leading to the basement. Shoop, he said, was talking smack and trying to get [Ledford] to come out. Shoop had no gun according to Flasher. Flasher testified that Shoop and a companion left after fifteen (15) or twenty (20) minutes. No gunshots were fired while they were there, he said. The shooting started, he testified, twenty (20) minutes later. He went back out on the porch and testified [that] Miah Shoop wasn't there. He never called the police when Shoop was there, he said, because it was just a mouth battle, playground talk between Shoop and Ledford. The witness indicated [that] he owned a dark green SUV which he always parked at the back of the lot.

Joshua Lemin testified for the Commonwealth. He said he became friends with [Ledford] through Dustin Scott. He got along, he said, with Rex Cuff.

On May 11, he testified he was with [Ledford] and Dustin [Scott] and that Rex [Cuff] was there for a short time. He was, he said, doing bath salts by [injecting] it in the vein. He was doing at that time [one] pack a day. He indicated [that] he was an addict.

Lemin related that during the shooting on May 11, he was hit in the arm. As a consequence, he said he spent twenty-one days at Pittsburgh UPMC, is required to wear a brace and does not have full use of his arm.

He testified that on May 11, the first time he recalled hearing about Jeremiah Shoop was when Shoop was outside the apartment. He remembered one (1) phone call between [Ledford] and Jeremiah [Shoop]. He testified [that] he heard [Shoop] yell "I'm out here, come out." He recalled the warning shots and the fact that [Ledford] ordered the lights turned off. He said that after the warning shots, he freaked out and wanted a gun. [Ledford], he said, was in charge, gave orders and handed out the guns. He picked up the Judge that was on an end table in the living room. He was told, he said, to keep watching the front doors as the others were in the rear of the apartment. They kept asking, he said, if the belt moved. He testified [that] he told them no. As he was unloading the revolver onto the end table, he testified [that] he was shot in the arm. He yelled for help, he said, and [Ledford] and Rex [Cuff] responded. He was shot, he said, with the shotgun.

Lemin was clear that he never saw Jeremiah Shoop on May 11, but he heard his voice and heard him say "I'm here, let's do this."

Rex Cuff testified for the defense. On May 11, Cuff said he went first to Dustin Scott's apartment and then to [Ledford's] place where he found Scott. He had known Scott since they were ten (10), he said, and on this day he indicated his friend was terrified. [Ledford] and [Scott], he said, explained what was going on and that Jeremiah [Shoop] was threatening to kill them. He testified [that] they were planning to go to Ace Hardware to acquire locks to secure the front door of the apartment when [Shoop] showed up. In a phone call, he said, Shoop challenged [Ledford] to come outside. [Ledford], he said,

refused and warned Shoop that if he tried to come into the apartment, he was armed. Cuff testified that it was common knowledge that [Ledford] had guns. He said he heard slamming on the door as if someone was trying to get in. [Ledford], he said, fired a warning shot. Josh Lemin, he said, had the revolver and fired a shot at the front door. The witness said he was terrified. Dustin [Scott], he said, shot Josh. He went to Lemin's aid and called 911. He said that even after Lemin was shot he continued to see the front door move. In this regard, he testified [that] he grabbed the belt securing the door and could feel someone outside pulling. He said [that] he heard someone above, and, after the police arrived[,] told them that there was someone upstairs. He opined that he believed [that it was Shoop.].

Cuff denied using bath salts that day. He also recalled that during the shooting the lights were out and that it was very dark in the apartment. Cuff said he was scared, not paranoid. He admitted that he never called the police although he had a cell phone; he never saw Jeremiah Shoop that afternoon and he saw no guns other than [Ledford's] guns.

The jury was taken to the scene of the events and given the opportunity to see [Ledford's] basement apartment.

Trial Court Opinion ("T.C.O."), 4/30/2013, at 3-14 (footnote omitted; minor grammatical modifications made for clarity).

Before closing arguments, Ledford's counsel requested that the judge instruct the jury on self-defense. Although admitting that it was a "close call," the trial court ultimately concluded that the evidence did not support a theory of self-defense, and, consequently, denied Ledford's request for the instruction. Notes of Testimony ("N.T."), 9/25/2012, at 71-80, 120. In so doing, the trial court also explicitly prohibited Ledford's counsel from arguing self-defense to the jury. *Id.* at 80 ("You are not allowed to argue self-defense.").

After hearing closing arguments and receiving the trial court's instructions, the jury convicted Ledford of the aforementioned crimes. On November 28, 2012, the Commonwealth filed a notice of its intention to pursue the mandatory minimum sentence of five to ten years' incarceration for the aggravated assault charge pursuant to 42 Pa.C.S. § 9712. On December 6, 2012, the trial court sentenced Ledford to five to ten years' incarceration pursuant to section 9712. The court imposed no further penalty on the REAP count, concluding that the charge merged with the aggravated assault count.

On December 17, 2012, Ledford filed post-sentence motions challenging, *inter alia*, the weight and sufficiency of the evidence, the trial court's denial of his request for a self-defense instruction, and the legality and discretionary aspects of his sentence. The trial court denied Ledford's post-sentence motions on April 30, 2013.

On May 29, 2013, Ledford filed a notice of appeal. The following day, the trial court directed Ledford to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). On June 20, 2013, Ledford timely complied. On July 11, 2013, the trial court issued an opinion pursuant to Pa.R.A.P. 1925(a).

Ledford raises the following six questions for our consideration:

1. Whether the trial court erred [] in denying the motion for judgment of acquittal challenging the sufficiency of the evidence inasmuch as the evidence did not suffice to prove beyond a reasonable doubt either the requisite intent of an

accomplice or negation of justification in self-defense and in defense of others?

2. Whether the trial court abused its discretion in denying the motion for new trial asserting that the verdict was against the weight of the evidence due to the corroborated testimony of an eyewitness?

3. Whether the trial court erred in omitting to instruct on justification in self-protection pursuant to 18 Pa.C.S. § 505 and in defense of others pursuant to 18 Pa.C.S. § 506, which controlled the outcome?

4. Whether the trial court erred by imposing a five-year mandatory minimum term pursuant to 18 Pa.C.S. § 9712 in that such imposition was inapplicable and illegal since applicability was not decided by the jury beyond a reasonable doubt as an element of the crime in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution and of the jury trial guarantee of the Sixth Amendment to the United States Constitution?

5. Whether the trial court abused its discretion in limiting the cross-examination of Joshua Lemin, the victim, about pending charges against Lemin out of the same incident as that in this appeal, which excluded cross-examination was intended to impeach Lemin for bias and credibility?

6. Whether the trial court abused its discretion in admitting photographs of wounds to Joshua Lemin, the victim, which were not relevant and, if relevant, were inflammatory and their evidentiary value was outweighed by unfair prejudice?

Brief for Ledford at 7-8.

For reasons set forth in more detail below, we ultimately conclude that the trial court prejudicially erred by not instructing the jury on self-defense. Before addressing that claim, we first briefly review Ledford's sufficiency claim because, if meritorious, it would moot all of his other claims, including the instruction claim. However, Ledford's claim lacks merit.

Our standard of review is well-settled:

The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the finder of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. Estepp*, 17 A.3d 939, 943-44 (Pa. Super. 2011) (citing

*Commonwealth v. Brooks*, 7 A.3d 852, 856-57 (Pa. Super. 2010)).

A person is guilty of aggravated assault if he "attempts to cause serious bodily injury to another, or causes such injury intentionally, knowingly or recklessly under circumstances manifesting extreme indifference to the value of human life." 18 Pa.C.S. § 2702(a)(1). "Serious bodily injury" is defined as "[b]odily injury which creates a substantial risk of death or which causes serious, permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." 18 Pa.C.S. § 2301. Regarding intent, "[a] person acts intentionally with respect to a

material element of an offense when . . . it is his conscious object to engage in conduct of that nature or to cause such a result." 18 Pa.C.S. § 302(b)(1)(i). Lastly, a jury may convict a defendant as an accomplice "so long as the facts adequately support the conclusion that he or she aided, agreed to aid, or attempted to aid the principal in planning or committing the offense, and acted with the intention to promote or facilitate the offense." *Commonwealth v. Markman*, 916 A.2d 586, 597 (Pa. 2007).

Ledford's overarching argument is that the evidence failed to prove beyond a reasonable doubt that he acted with the requisite intent to cause serious bodily injury, or with the specific intent required of an accomplice, for aggravated assault purposes. However, aside from making this bald assertion, Ledford offers no direct argument based upon the record as it stands in this case. Instead, Ledford argues that self-defense was "properly at issue" in this case, *see* Brief for Ledford at 16, and that his claim of self-defense defeated the intent elements of aggravated assault or accomplice liability.

The entirety of Ledford's argument centers on a recitation of self-defense principles, and the application of those principles to the facts presented at trial. His sufficiency argument is a thinly-veiled attempt at litigating the trial court's denial of his request for a self-defense instruction. That argument, while preserved below and proper in this direct appeal, is not a proper argument in the context of a sufficiency of the evidence challenge. Our task simply is to evaluate the evidence of record, including

any evidence that is improperly admitted, and determine whether that evidence was sufficient to enable the jury to find each of the elements of the crime beyond a reasonable doubt. **See Markman**, *supra*. The trial court prohibited Ledford from arguing self-defense, and, regardless of the propriety of that decision, relieved the Commonwealth of the burden of disproving self-defense beyond a reasonable doubt. Hence, the record that we must review does not contain a self-defense element, and a sufficiency challenge is not the proper venue to re-litigate that decision. Thus, we do not consider whether the evidence demonstrated, as Ledford wishes, that he acted in self-defense, or whether the Commonwealth disproved such an assertion. Rather, we evaluate the record as it stands and determine whether the evidence supports the jury's finding that Ledford acted with specific intent. Ledford not having presented any proper argument to the contrary, we conclude that the evidence was sufficient to support the jury's verdict beyond a reasonable doubt.

We now turn to the issue of whether the trial court erred in denying Ledford's request for an instruction on self-defense. "[O]ur standard of review when considering the denial of jury instructions is one of deference – an appellate court will reverse a court's decision only when it abused its discretion or committed an error of law." **Commonwealth v. Baker**, 24 A.3d 1006, 1022 (Pa. Super. 2011) (quoting **Commonwealth v. Galvin**, 985 A.2d 783, 798-99 (Pa. 2009)). "The trial court has broad discretion in phrasing its instructions, and may choose its own wording so long as the law

is clearly, adequately, and accurately presented to the jury for its consideration." *Id.* (quoting *Commonwealth v. Prosdocimo*, 578 A.2d 1273, 1274 (Pa. 1990)).

It is well-settled that "[a] trial court is not obligated to instruct a jury upon legal principles [that] have no applicability to the presented facts. There must be some relationship between the law upon which an instruction is [requested] and the evidence presented at trial." *Commonwealth v. Buksa*, 655 A.2d 579, 583 (Pa. Super. 1995) (quoting *Commonwealth v. Tervalon*, 345 A.2d 671, 678 (Pa. 1975)). However, "[a] defendant is entitled to an instruction on any recognized defense [that] has been requested [and] has been made an issue in the case, and for which there exists evidence sufficient for a reasonable jury to find in his or her favor." *Id.* (internal quotation marks and citations omitted). Regarding a request for a self-defense instruction, the charge "**must** be given upon request if there is evidence presented, **from any source**, that the defendant acted in self-defense." *Commonwealth v. Gonzales*, 483 A.2d 902, 903 (Pa. Super. 1984) (citing *Commonwealth v. Brown*, 421 A.2d 660 (Pa. 1980)) (emphasis added). Additionally, a defendant who makes such a showing also is entitled to a charge that the Commonwealth bears the burden of disproving self-defense beyond a reasonable doubt. *Id.* (citing *Commonwealth v. Rittle*, 428 A.2d 168 (Pa. Super. 1981)).

In ***Commonwealth v. Mayfield***, 585 A.2d 1069 (Pa. Super. 1991), we explained at length the respective obligations of both a defendant and the trial court when a self-defense instruction is requested:

Before the issue of self-defense may be submitted to a jury for consideration, a valid claim of self-defense must be made out as a matter of law, and this determination must be made out as a matter of law, and this determination must be made by the trial judge. Such [a] claim may consist of evidence from whatever source. "Such evidence may be adduced by the defendant as part of his case, or conceivably, may be found in the Commonwealth's own case in chief or be elicited through cross-examination." ***Commonwealth v. Rose***, 321 A.2d 880, 884 (Pa. 1974) (similarly discussing the type of evidence necessary to place in issue a defense of intoxication). However, such evidence from whatever source must speak to three elements for a claim of self-defense to be placed in issue for the jury's consideration.

> Thus, as provided by statute and as interpreted through our case law, to establish a defense of self-defense it must be shown that a) the slayer was free from fault in provoking or continuing the difficulty which resulted in the slaying; b) that the slayer must have reasonably believed that he was in imminent danger of death or great bodily harm, and that there was a necessity to use force in order to save himself therefrom; and c) the slayer did not violate any duty to retreat or to avoid the danger. ***Commonwealth v. Myrick***, 360 A.2d 598 (Pa. 1976); ***Commonwealth v. Cropper***, 345 A.2d 645 (Pa. 1975).

***Commonwealth v. Black***, 376 A.2d 627, 630 (Pa. 1977). If there is **any** evidence from whatever source that will support these three elements then the decision as to whether the claim is a valid one is **left to the jury and the jury must be charged properly thereon by the trial court**.

> Our case law makes it crystal clear that the charge of self-defense must be given upon request where the jury would have a possible basis for finding it. ***See Black***, *supra*.

> While there is no burden on the defendant to prove a claim of self-defense, it is nevertheless required that before such

> defense is properly in issue at trial, there must be some evidence, from whatever source, to justify such a finding. *Id.* at 630. *See Commonwealth v. Walley*, 353 A.2d 396, 398 n.2 (Pa. 1976); *Cropper*, 345 A.2d at 649.
>
> Thus, if there was evidence which would have supported the claim of self-defense, it was for the trier of fact to pass upon that evidence and improper for the trial judge to exclude such consideration by refusing the charge. *Gonzales*, *supra*; *Commonwealth v. Lowe*, 333 A.2d 765 (Pa. 1975).
>
> *Commonwealth v. Brown*, 421 A.2d 660, 662 (Pa. 1980); *in accord Commonwealth v. Bailey*, 471 A.2d 551 (Pa. Super. 1984) and *Commonwealth v. Maione*, 554 A.2d 939 (Pa. Super. 1989). This is so even though the evidence of self-defense may appear to the trial court as not credible, for "it is the province of the trier of fact to pass upon the credibility of witnesses and the weight to be accorded the evidence produced. . . . The fact finder is free to believe all, part, or none of the evidence." *Commonwealth v. Rose*, 344 A.2d 824, 826 (Pa. 1975).

*Mayfield*, 585 A.2d at 1070-71 (emphasis added; citations modified); *see Commonwealth v. Hansley*, 24 A.3d 410, 420-21 (Pa. Super. 2011) (citing *Mayfield* for the above standards).

From these well-settled standards, three pertinent principles emerge: (1) the defendant must present some evidence as to each of the three self-defense elements from whatever source; (2) the trial court must determine whether the defendant has made such a showing, but cannot evaluate the credibility of the evidence or the likelihood of success of the defense, which are functions reserved exclusively for the jury; and (3) once the defendant presents evidence from whatever source on each of the three self-defense

elements, the trial court does not have discretion to decide whether to impose the instruction; rather, the court is legally mandated to do so.

Applying these principles to the instant case, it is clear that Ledford was entitled to a self-defense instruction. Ledford first had to adduce evidence that he was free from fault in provoking the incident which led to the shooting of Josh Lemin. In his interview with police after the shooting, which was recorded and played in its entirety for the jury, Ledford admitted that he and his friends had been using bath salts on the day in question. While doing so, for whatever reason, the party concluded that Jeremiah Shoop was going to come and steal their remaining supply of bath salts, by force if necessary. Notably, Ledford told the police that he **received** a call from Shoop, during which Ledford warned Shoop to stay away from his apartment and to leave them alone. That Ledford received the phone call, and did not make it, is evidence that Ledford did not provoke the incident but sought to prevent it. Shortly thereafter, Shoop and another person drove to Ledford's apartment, got out of their vehicle, and approached Ledford's door, which was held shut by at least one belt. Ledford reported to the police that, when Shoop approached the door, Shoop was taunting him and requesting that Ledford come outside.[3] Ledford believed that Shoop

_____

[3]   Shelby Flasher, Ledford's upstairs neighbor, also testified that Shoop was kneeling outside of Ledford's apartment, taunting Ledford and attempting to draw Ledford out of the apartment.

wanted him to come outside either to assault him or to steal the bath salts. Again, it is critical to our analysis that, according to Ledford, Shoop sought Ledford out, and not the other way around. Thus, from just Ledford's interview with police, Ledford established **some** evidence that he did not provoke the incident, and that it was Shoop who instigated and inflamed the encounter by initiating contact with Ledford, driving to Ledford's apartment, and taunting and encouraging Ledford to confront him.

Ledford also had to produce evidence that he reasonably believed that he was in imminent danger of death or serious bodily injury. In his interview with police, Ledford explained to the police that he and his cohort came to fear that Shoop intended to forcibly steal their remaining bath salts. In response to this fear, Ledford and his friends strapped the door to the apartment shut with a belt and armed themselves with weapons to stave off Shoop's impending assault. Rex Cuff testified that Ledford was terrified on the day in question. When Cuff arrived at Ledford's apartment, Ledford informed Cuff that Shoop had threatened to kill them. Cuff testified that they were planning to go to the hardware store to get locks for the door, because they feared that Shoop was going to come to the apartment. When Shoop arrived at Ledford's apartment, he repeatedly pulled on Ledford's door and challenged Ledford to come outside. These averments, heard by the jury, constituted **some** evidence that Ledford feared that Shoop intended to hurt, or kill, Ledford and his friends. Because Shoop allegedly

came to the apartment and challenged Ledford, there also was **some** evidence to demonstrate that Ledford's fear was reasonable.

Lastly, Ledford was required to offer evidence that he did not violate a duty to retreat. In Pennsylvania, a person has no duty to retreat from his own home unless he was the initial aggressor. ***Commonwealth v. Hornberger***, 74 A.3d 279, 283-86 (Pa. Super. 2013). Ledford was in his own apartment. As noted above, Ledford presented some evidence that he was not the initial aggressor. Thus, Ledford also adduced **some** evidence that he did not violate his duty to retreat.

A brief review of the notes of testimony demonstrates that Ledford presented **some** evidence, from whatever source, as to each of the three elements of self-defense. Self-defense fairly was at issue in this case, and the trial court's failure to instruct the jury accordingly was a clear error.

The trial court held that Ledford did not satisfy the second self-defense element, that Ledford reasonably believed that he was in imminent danger of death or serious bodily injury, because, according to the court, there was "no evidence whatsoever that anyone exerted 'unlawful force' under [18 Pa.C.S. §] 505(a) toward [Ledford] or his friends." T.C.O., 4/30/2013, at 16. While this may be true, it misses the point. Ledford did not have to demonstrate that unlawful force actually was used against him. He only had to adduce evidence to demonstrate that he reasonably believed that he faced the threat of such force. ***See Mayfield***, *supra*. As we set forth above, Ledford satisfied this burden.

To be clear, we do not conclude that Ledford's defense would have succeeded at trial. The record contains evidence that contradicts or undermines some of Ledford's evidence of self-defense. However, our obligation is not to re-weigh evidence, or evaluate the potential success of Ledford's defense. Our duty solely is to evaluate the record and to determine whether Ledford satisfied his burden to trigger the trial court's mandate to instruct the jury on self-defense. We conclude that he did. The jury should have been apprised of the elements and respective burdens associated with a self-defense claim. The jury was denied that opportunity in this case.

Not only did the trial court refuse to instruct the jury on self-defense, the court also expressly prohibited Ledford from arguing self-defense to the jury. N.T., 9/25/2012, at 80. Consequently, we cannot conclude that the trial court's error was harmless,[4] or that Ledford was not prejudiced by the

_____

[4]    Our Supreme Court has explained the doctrine of harmless error as follows:

> An error will be deemed harmless where the appellate court concludes beyond a reasonable doubt that the error could not have contributed to the verdict. If there is a reasonable possibility that the error may have contributed to the verdict, it is not harmless. In reaching that conclusion, the reviewing court will find an error harmless where the uncontradicted evidence of guilt is overwhelming, so that by comparison the error is insignificant. The burden of establishing that the error was harmless rests upon the Commonwealth.

*(Footnote Continued Next Page)*

court's error. Hence, the trial court abused its discretion and Ledford is entitled to a new trial. Because we order a new trial, Ledford's remaining issues are moot.

Judgment of sentence vacated. Case remanded for a new trial. Jurisdiction relinquished.

Mundy, J. files a Dissenting Statement.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/5/2014

---

*(Footnote Continued)* ——————————

**Commonwealth v. Mitchell**, 839 A.2d 202, 214–15 (Pa. 2003).