J-S52037-16

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| v. | : | |
| | : | |
| DARRYL YOUNG, | : | |
| | : | |
| Appellant | : | No. 1715 EDA 2015 |

Appeal from the Judgment of Sentence January 21, 2015,
in the Court of Common Pleas of Philadelphia County,
Criminal Division, at No(s): CP-51-CR-0005703-2011
CP-51-CR-0005704-2011
CP-51-CR-0015810-2010

BEFORE:    FORD ELLIOTT, P.J.E., STABILE and STRASSBURGER,* JJ.

MEMORANDUM BY STRASSBURGER, J.:          **FILED SEPTEMBER 20, 2016**

Darryl Young (Appellant) appeals from the judgment of sentence entered following his conviction for multiple counts of first-degree murder, attempted homicide, aggravated assault, violations of the Uniform Firearms Act, and possession of an instrument of crime.  We affirm.

The charges in this matter stem from Appellant's arrest for three shooting incidents which occurred in Philadelphia on September 24, October 26, and October 27, 2009. The trial court aptly set forth the relevant facts of those cases as follows.

> On September 24, 2009, around 2:39 p.m. on the 1300 block of North 56th Street in Philadelphia, Kevin Hubbard Jr. and Allen Thompson were walking to the corner deli to pick up lunch when they noticed [Appellant] approaching them on a bicycle. Hubbard and Thompson retreated as [Appellant] approached, with Hubbard beginning to enter his aunt's home and Thompson going to the door of a friend who lived next door to Hubbard's aunt. Before either Hubbard or Thompson could enter the

*Retired Senior Judge assigned to the Superior Court.

homes, [Appellant] reached into his pants and withdrew a black firearm, pointing it at both Hubbard and Thompson. [Appellant] then began shooting at Hubbard before turning to shoot at Thompson, firing multiple times. [Appellant] then fled the scene on his bike. Also present at the scene of the shooting was Ernest Howard, Jr.

Responding police officers found Hubbard lying on the porch and immediately placed him in the back of a police car, rushing him to the Hospital of the University of Pennsylvania ("HUP"). Hubbard was pronounced dead at HUP at 3:29 p.m. Hubbard died from a gunshot wound to the chest, where the bullet penetrated his left lung, pulmonary artery, heart, diaphragm, stomach, and left kidney. Thompson was struck by a bullet in the interior of his right bicep. Thompson was also transported to HUP, where he underwent surgery. As a result of the gunshot wound, Thompson suffered from sustained nerve damage.

Police recovered six fired cartridge cases in front of 1337 North 56th Street. Two bullets were also recovered from the 1339 North 56th Street home: one from the floor inside of the house and one from the doorjamb. Subsequent analysis revealed that all of the fired cartridge cases were fired from the same weapon.

On October 26, 2009, at approximately 6:15 p.m., David Bowen, Christopher Bolger, and Derrick Bolton were walking on Master Street between 56th Street and 57th Street in Philadelphia, returning from school. Howard was also present at the time. Bolger noticed [Appellant], with two other males, walking across the street, wearing hoodies. Bowen noticed [Appellant] approach from behind, pull a firearm from his pants, and begin to shoot.

Bowen was shot once in his left arm and once in his left leg. Bolger was shot in the stomach, back, and chest. Bolton was shot in his left calf. All victims were transported to HUP for medical treatment. While still receiving treatment in the hospital, Bolger identified [Appellant] as the individual who had shot him. At the time that [Appellant] shot Bolger and Bolton, he was attempting to shoot Ernest Howard Jr., who was present at the

first shooting and had told Bolger that [Appellant] "was going to kill [Howard] because [he] knew too much."

Police recovered a nine millimeter semiautomatic handgun at the scene of the shooting, as well as fourteen fired cartridge cases. Subsequent analysis of the cartridge cases revealed that five were fired from the firearm recovered at the scene, nine were fired from an unrecovered nine millimeter firearm, and one was fired from an unrecovered .40 caliber firearm.

On October 27, 2009, the day after the second shooting, at approximately 7:00 p.m. Howard and Ernest Winston were driving … near 57th Street and Master Street when Howard noticed a friend walking on the street and pulled over to talk to him. Howard exited the vehicle in order to talk to the person at the front of the car while Winston remained inside. Winston exited the vehicle in order to get a light from Howard and then returned to the vehicle. Upon returning to the vehicle, Winston heard multiple gunshots coming from behind the vehicle and ducked for cover. Winston then looked behind him and saw [Appellant] with a silver gun in his hand. Howard ran across the street towards a bar and collapsed on the street. Winston ran after Howard and, after noticing blood on the street, went to a house on Frazier Street to try to get help.

Responding police officers located Howard face down on the ground. Police immediately placed Howard in a patrol car and rushed him to HUP. Howard was alive at the time police arrived, but was pronounced dead at 8:58. Howard suffered a penetrating gunshot wound to his right torso, which pierced his liver, stomach, intestines, pancreas, vena cava, spleen, diaphragm, and left lung. The bullet was recovered as part of medical intervention and provided to police.

Winston later told police that Howard was friends with Thompson, who was shot by [Appellant] in the first shooting, and that [Appellant] wanted to kill Howard because Howard knew about [Appellant] shooting Thompson.

Subsequent analysis of a bullet hole in Howard's car showed that the damage was consistent with the car having been struck from a shooter standing in the alley behind the

vehicle. Bullet fragments were recovered from the interior of the car. Police also recovered five .45 caliber fired cartridge cases from the alley behind the vehicle. One .45 caliber bullet was recovered from Howard and a .45 caliber bullet fragment was recovered from the scene. Subsequent analysis of the fired cartridge cases revealed that all were fired from the same firearm.

Trial Court Opinion, 9/29/2015, at 2-6 (citations and footnotes omitted).

The three cases were consolidated for a capital trial and, on January 16, 2015, Appellant was found guilty of the aforementioned charges. On January 21, following a penalty phase hearing, the jury returned a verdict of life imprisonment on both first-degree murder convictions. That day, the court imposed a sentence of two consecutive terms of life imprisonment, followed by a term of 50 to 100 years' incarceration on the remaining counts. Appellant's timely-filed post-sentence motions were denied on May 18, 2015. This appeal followed. Both Appellant and the trial court complied with the mandates of Pa.R.A.P. 1925.

On appeal, Appellant asks us to consider the following questions.

I. Was the evidence insufficient to convict [Appellant] of all the offenses because there was no evidence showing beyond a reasonable doubt that [Appellant] was the perpetrator of the offenses?

II. Did the trial court err in granting the Commonwealth['s] motion to consolidate the three separate cases because these cases were not inextricably intertwined and because each case happened on different dates and over one month separated the first incident from the second and third incident with different witnesses and different victims?

- 4 -

Appellant's Brief at 2.

We address Appellant's first argument mindful of the following standard of review.

> [O]ur standard of review of sufficiency claims requires that we evaluate the record in the light most favorable to the verdict winner giving the prosecution the benefit of all reasonable inferences to be drawn from the evidence. Evidence will be deemed sufficient to support the verdict when it establishes each material element of the crime charged and the commission thereof by the accused, beyond a reasonable doubt. Nevertheless, the Commonwealth need not establish guilt to a mathematical certainty. Any doubt about the defendant's guilt is to be resolved by the fact finder unless the evidence is so weak and inconclusive that, as a matter of law, no probability of fact can be drawn from the combined circumstances.

*Commonwealth v. Lynch*, 72 A.3d 706, 707-08 (Pa. Super. 2013) (internal citations and quotation marks omitted). The Commonwealth may sustain its burden by means of wholly circumstantial evidence, and we must evaluate the entire trial record and consider all evidence received against the defendant. *Commonwealth v. Markman*, 916 A.2d 586, 598 (Pa. 2007).

Instantly, Appellant argues that the Commonwealth failed to establish his identity as the shooter in all three incidents beyond a reasonable doubt. Appellant's Brief at 6. Specifically, Appellant claims that the lack of physical and circumstantial evidence that he was the perpetrator, coupled with the fact that each of the alleged eyewitnesses later recanted their identifications of Appellant, renders insufficient the evidence to support his convictions. *Id.* The trial court addressed this claim as follows.

Regarding the first shooting, Allen Thompson, the victim who survived [Appellant's] first attack, provided a statement to police five days following the shooting. Thompson informed police that he witnessed [Appellant] ride up the street on his bike, which prompted him and Hubbard to stop what they were doing and return to the presumed safety of their houses. Thompson further informed police that he witnessed [Appellant] reach into his pants, pull out a black gun, and begin shooting Hubbard. After shooting Hubbard, Thompson told police that [Appellant] then began shooting at him. Thompson further described [Appellant] to police as "black, light-skinned. He is about 5'6", 5'7", short dude. He is middle size, low cut hair," and that [Appellant] was wearing all black. Thompson informed police that he and [Appellant] had gone to school together and that he knew [Appellant] "from around the way." When police presented Thompson with a photo array, Thompson identified [Appellant].

Jamal Briggs corroborated Thompson's statement when questioned by the police on October 2, 2009. Briggs testified and informed police that he heard shots fired from around the corner on Frazier Street and went to investigate. In his statement, Briggs informed police that he had seen [Appellant], on a bicycle, "come off of 56th Street and make a right … down towards 55th" immediately following the shooting. Like Thompson, when police provided a photo array to Briggs, Briggs identified [Appellant] as the individual he saw fleeing the scene on a bike.

Regarding the second shooting, which occurred on October 26, 2009, Christopher Bolger provided a statement to police while still receiving treatment in the hospital. Bolger informed police that he saw [Appellant], together with two or three other unidentified males, passing by him shortly before the shooting. In this initial interview, Bolger identified [Appellant] as the individual who shot him and identified [Appellant] in a photo array. In a second interview with police, occurring on July 31, 2010, Bolger again identified [Appellant] as one of the individuals who shot him, and further identified one of the other shooters. Bolger informed police that Howard, the victim of the third shooting, had been present during the second shooting and that Howard was the real target of the attack. Bolger stated that

[Appellant] had previously told Howard he would kill him because he "knew too much." Bolger also told police that Howard had stated that he was present when Thompson and Hubbard had been shot in the first shooting. Bolger's testimony from the preliminary hearing in this matter was also admitted at trial. At the preliminary hearing, Bolger acknowledged that he had informed police that he had been shot by [Appellant], but attempted to recant his identification.

In addition, David Bowen provided a statement to police four days following the second shooting. Bowen informed police that he saw [Appellant] approach from behind him, wearing all black, pull out a black gun from his pants, and start shooting. Bowen stated that he knew [Appellant] from around the neighborhood and described [Appellant] as a "black male like 19-years-old, 5'8" … tall, caramel complexion, like 140 pounds. His hair is cut close ... [and] on his neck he has a tattoo of a skull with crossbones going through it." While Bowen declined to identify [Appellant] during a separate, earlier interview while still in the hospital, Bowen identified [Appellant] in a photo array as part of his written statement to police, stating that [Appellant] had shot at him. Bowen further stated that he had not previously identified [Appellant] because he was afraid of him "because he will start shooting at you for no reason."

Regarding the third shooting of October 27, 2009, Ernest Winston provided a statement to police less than a day after the shooting. In this statement, Winston informed police that, after hearing gunshots from behind him, he turned and saw [Appellant] with a silver automatic handgun in his hands. Winston described [Appellant] as slightly shorter than 5'10", wearing a green hoodie and dark pants, and with a skull tattoo on the front of his neck. While Winston recanted his identification testimony at trial, Winston had acknowledged at the preliminary hearing that he remembered telling the police that he had seen [Appellant] with a gun at the third shooting. Winston further identified [Appellant] in a photo array when interviewed by police the day after the shooting. Winston also informed police that [Appellant] wanted to kill Howard because Howard knew about [Appellant] shooting Thompson a month earlier. Finally, Winston also told Bolger, a victim from the second shooting, that [Appellant] had shot Howard.

It is true that at trial, the above witnesses recanted the majority of their statements to the police. However, their signed statements were admitted at trial through the testimony of their respective interviewing detectives. These statements were admissible for their truth as prior inconsistent statements that were signed and adopted by the declarants. *See* Pa.R.E. 803.1(1)(b). It is well-established that where a witness at trial recants a statement he made to police, the fact-finder is "free to evaluate both the [witness's] statement to police as well as his testimony at trial recanting that statement, and [is] free to believe all, part, or none of the evidence." ***Commonwealth v. Hanible,*** 836 A.2d 36, 40 (Pa. 2003). Such recantations are "notoriously unreliable," ***Commonwealth v. Johnson***, 966 A.2d 523, 541 (Pa. 2009), and "the mere fact that [the only eyewitness] recanted a statement he had previously made to the police certainly does not render the evidence insufficient to support [the] conviction." ***Hanible***, 836 A.2d at 40. Moreover, a conviction may rest entirely on prior inconsistent statements of witnesses who testify at trial, and such statements "must … be considered by a reviewing court in the same manner as any other type of validly admitted evidence when determining if sufficient evidence exists to sustain a criminal conviction." ***Commonwealth v. Brown***, 52 A.3d 1139, 1171 (Pa. 2012).

Accordingly, the above identification evidence was more than sufficient to establish that [Appellant] was the perpetrator of the murders and shootings here at issue. As [Appellant] was also identified as the individual in possession of the firearm at each of the three shootings, the evidence was also sufficient to establish his identity for purposes of the firearm related charges.

Trial Court Opinion, 9/29/2015, at 7-11 (citations to notes of testimony and footnotes omitted).

We agree with the well-reasoned analysis of the trial court. It is well established that "the evidence at trial need not preclude every possibility of innocence, and the fact-finder is free to resolve any doubts regarding a

defendant's guilt unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances." ***Commonwealth v. Hughes***, 908 A.2d 924, 928 (Pa. Super. 2006). Instantly, even accounting for the recantations of the aforementioned witnesses, the evidence presented herein was more than sufficient to permit the jury to conclude that Appellant possessed a firearm and perpetrated all three shootings. Accordingly, Appellant's claim fails.

In his second claim, Appellant argues that the trial court erred in granting the Commonwealth's motion to consolidate the three cases because "each case happened on different dates and over one month separated the first incident from the second and third incident with different witnesses and different victims." Appellant's Brief at 7-9. Further, Appellant claims he was prejudiced by the consolidation. ***Id.*** at 9.

As this Court has explained,

[w]hether or not separate indictments should be consolidated for trial is within the sole discretion of the trial court and such discretion will be reversed only for a manifest abuse of discretion or prejudice and clear injustice to the defendant.

Pennsylvania Rule of Criminal Procedure 582 provides that joinder of offenses charged in separate indictments or informations is permitted when the evidence of each of the offenses would be admissible in a separate trial for the other and is capable of separation by the jury so that there is no danger of confusion. Evidence of other criminal behavior is not admissible to show a defendant's propensity to commit crimes. However, such evidence may be admitted for other purposes, such as proof of motive, opportunity, intent, preparation, plan,

- 9 -

knowledge, identity or absence of mistake or accident so long as the probative value of the evidence outweighs its prejudicial effect.

***Commonwealth v. Smith****, 47 A.3d 862, 867 (Pa. Super. 2012) (citations omitted). The establishment of a common scheme, plan, or design "requires only that there are shared similarities in the details of each crime."

***Commonwealth v. Newman****, 598 A.2d 275, 278 (Pa. 1991).

The trial court set forth its reasons for granting the Commonwealth's motion to consolidate as follows.

> Here, it was clearly established at a hearing on the Commonwealth's motion to consolidate that the three cases were properly joined. While each case concerned criminal acts that occurred on separate days, they were all inextricably intertwined. First, the shootings all occurred within a very narrow geographical area and were centered on a dispute between two warring drug gangs. Therefore, the three separate days upon which [Appellant] went on his murderous rampage were all part of a common scheme and plan to defeat competing drug dealers. All of the shootings were therefore admissible in trials of the other shootings to show motive, intent, and a common scheme and plan.
>
> In addition, Howard, the murder victim in the third day of shootings, was a witness to the killing of Hubbard and the wounding of Thompson on the first day of shootings. Moreover, the evidence showed that on the second day of shootings, when [Appellant] shot Bowen, Bolger and Bolton, he was actually attempting to kill Howard to eliminate him as a witness to the first day of shootings. On the third day of shootings, [Appellant] succeeded in eliminating Howard. Accordingly, the first shootings were essential to establish the motive and intent leading to the second and third shootings, just as the second shootings were essential to establish the motive and intent for the third. Similarly, at a trial of the first shootings, the second and third shootings would have been admissible as highly probative

- 10 -

evidence of [Appellant's] consciousness of guilt in attempting, and succeeding, in silencing an eyewitness to that first shooting. All of the evidence was necessary to tell the complete story to the factfinder. Therefore, "evidence of each of the offenses would be admissible in a separate trial for the other" as required by Rule 582.

Additionally, each shooting was easily separable from the others by both date and victims, preventing any possible confusion by the jury. [E]ach shooting would have been admissible in a separate trial for each event, and [] each shooting was easily distinguishable by date and victim[.]

Trial Court Opinion, 9/29/2015, at 14-15.

Our review of the record supports the trial court's determinations. The evidence presented at trial established that all three shootings were gang-related and interconnected such that each was admissible at the trial of the others to show a common plan or scheme. *Smith*, *supra*. Moreover, contrary to Appellant's argument, the details of each case were substantially similar, despite the fact that they occurred over the course of a month.

Moreover, we reject Appellant's argument that he was prejudiced by the consolidation. Appellant's Brief at 9.

The "prejudice" of which [the joinder rule] speaks is not simply prejudice in the sense that appellant will be linked to the crimes for which he is being prosecuted, for that sort of prejudice is ostensibly the purpose of *all* Commonwealth evidence. The prejudice of which [the joinder rule] speaks is, rather, that which would occur if the evidence tended to convict appellant only by showing his propensity to commit crimes, or because the jury was incapable of separating the evidence or could not avoid cumulating the evidence.

- 11 -

*Newman*, 598 A.2d at 279 (citation omitted). Such prejudice was not present in the instant matter: the three incidents were distinct enough to permit the jury to separate the evidence. Moreover, based on the volume of evidence supporting his conviction, Appellant has failed to establish that he was convicted due to the jury's belief that he had the propensity to commit crimes. Accordingly, we find that the trial court did not abuse its discretion in consolidating Appellant's cases.

Judgment of sentence affirmed. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.

Prothonotary

Date: 9/20/2016